## STATE OF CONNECTICUT *v.* RAUL IVAN DIAZ
### (15093)

Peters, C. J., and Callahan, Berdon, Katz and Palmer, Js.

Argued March 28—officially released July 2, 1996

*Kent Drager*, assistant public defender, for the appellant (defendant).

*Frederick W. Fawcell*, assistant state's attorney, with whom, on the brief, were *Donald A. Browne*, state's attorney, and *C. Robert Satti, Jr.*, assistant state's attorney, for the appellee (state).

PALMER, J. A jury found the defendant, Raul Ivan Diaz, guilty of murder in violation of General Statutes

§ 53a-54a (a),[1] conspiracy to commit murder in violation of General Statutes §§ 53a-48[2] and 53a-54a (a), two counts of attempted murder in violation of General Statutes §§ 53a-49[3] and 53a-54a (a), and carrying a pistol

[1] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[2] General Statutes § 53a-48 provides: "Conspiracy. Renunciation. (a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in furtherance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[3] General Statutes § 53a-49 provides: "Criminal attempt: Sufficiency of conduct; renunciation as defense. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute a crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(b) Conduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) of this section unless it is strongly corroborative of the actor's criminal purpose. Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law: (1) Lying in wait, searching for or following the contemplated victim of the crime; (2) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission; (3) reconnoitering the place contemplated for the commission of the crime; (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances; (7) soliciting an innocent agent to engage in conduct constituting an element of the crime.

"(c) When the actor's conduct would otherwise constitute an attempt under subsection (a) of this section, it shall be a defense that he abandoned

without a permit in violation of General Statutes § 29-35 (a).[4] On appeal[5] from the judgment of the trial court,[6] the defendant claims that the court improperly: (1) instructed the jury on the principle of vicarious liability of a conspirator under *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946); (2) instructed the jury on common design liability as an alternate form of accessory liability; (3) denied his motion for a judgment of acquittal on the ground that there was insufficient evidence to sustain his convictions of murder, attempted murder and conspiracy to commit murder; (4) instructed the jury that it could infer the defendant's intent to cause the death of another in light of his use of a dangerous weapon, thereby relieving the state of its burden of proof on an element of the crime of murder in violation of the due process clause of the federal constitution; and (5) permitted the state to introduce impeachment evidence on a collateral matter. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of June 26, 1991, Hector Gonzalez

his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[4] General Statutes § 29-35 provides in relevant part: "Carrying a pistol or revolver without permit prohibited. Exceptions. (a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. . . ."

[5] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[6] The trial court sentenced the defendant to consecutive prison terms of sixty years on the murder count, twenty years on each of the two attempted murder counts, and five years on the count of carrying a pistol without a permit. In addition, the defendant was sentenced to twenty years imprisonment on the conspiracy charge, to be served concurrently with his sentences on the other counts, for a total effective sentence of 105 years.

(Gonzalez) and his wife, Valerie Falcon, drove to Seaside Park in Bridgeport with their two year old son, Hector Gonzalez, Jr., and Falcon's eight year old son, William Guisti, Jr. While at the park, they met Fitzgerald Guisti (Guisti), an uncle of William Guisti, Jr. Guisti informed Gonzalez and Falcon that he was planning to drive to the east side of Bridgeport to purchase some marijuana. Gonzalez and Falcon agreed to follow Guisti in their vehicle, a Ford Bronco. The two vehicles then left the park. Gonzalez, accompanied by Falcon in the front seat and the two children in the back seat, drove the Bronco, while Guisti drove alone in his car.

Guisti, followed by Gonzalez and his three passengers in the Bronco, proceeded to the corner of Hallett and Jane Streets where several men, including Gerald Torres, Sammy Segarra, Juan Rivera, a man identified only as "Edgar" and the defendant, were congregated. Guisti pulled his car over to the side of the road to inquire whether any of the men had marijuana for sale. Gonzalez drove the Bronco past Guisti's vehicle and continued down Jane Street toward Helen Street.

Torres, in response to Guisti's inquiry, stated that he had some marijuana and told Guisti to get out of his car. As Guisti was exiting his automobile, he heard Torres yell, "that's the truck, let's do the truck," an apparent reference to the Bronco, which had just passed by and was proceeding down Jane Street toward Helen Street. Meanwhile, Gonzalez had turned the Bronco around on Helen Street and was traveling back toward Jane Street in the direction of Guisti's vehicle. Torres, Segarra, Rivera, Edgar and the defendant hurriedly retrieved guns from a nearby automobile and hid behind several cars parked on the street to await Gonzalez' return.

As Gonzalez approached and passed the parked cars behind which they were hiding, the men ran out into the

street and began shooting at the Bronco. One member of the group was armed with an Uzi-type machine gun and the others were carrying handguns.[7] Guisti yelled to the group that there was a child in the Bronco, to which Torres replied, "Fuck it, keep on," and the shooting continued. The men fired about thirty-five to forty shots at the Bronco,[8] approximately ten of which actually struck the vehicle. Three of the bullets passed through the passenger compartment of the Bronco and exited through the front windshield. William Guisti, Jr., was fatally injured when a 9 millimeter bullet passed through his heart, lung and liver. The defendant was thereafter arrested, charged and tried for the crimes of murder,

[7] The trial testimony was conflicting as to the precise number of people involved in the shooting and as to which individual was carrying the Uzi-type automatic weapon. Gonzalez testified that the defendant and four others participated in the assault and that Torres was in possession of the automatic weapon. Gonzalez also testified, however, that he did not actually see the defendant in possession of a weapon. Guisti testified that there were five or six people shooting and that either Segarra or Rivera had the Uzi-type weapon. John Marrero, another state's witness, testified that he saw four people in the street: the defendant, who was firing a pistol; Edgar, who had a 9 millimeter handgun; an unidentified black male, who was armed with an automatic weapon; and Torres, who did not have a gun. Joel Guadarrama, also a state's witness, testified that three people participated in the shooting: the defendant, who had a machine gun; Edgar, who was armed with a .45 caliber handgun; and Torres, who possessed an unspecified type of gun. The only defense witness to the ambush, Luis Alago, testified that there were three shooters, that the defendant was not one of them, and that one of the assailants had an automatic weapon.

[8] A total of thirty-three 9 millimeter shell casings were recovered at the scene of the shooting. Ballistics tests demonstrated that thirty-one of the shell casings were from bullets that had been fired from one of the guns and that two of the casings were from bullets that had been fired from a second gun. Seven .45 caliber casings were also recovered, all of which had been fired from the same gun. A total of four spent bullets were recovered: one .45 caliber bullet; two 9 millimeter bullets, each of which had been fired from the same gun; and a third 9 millimeter bullet. Due to damage sustained by the third 9 millimeter bullet, it could not be determined whether it had been fired from the same gun as the other two 9 millimeter bullets that were found at the scene.

attempted murder, conspiracy to commit murder and carrying a pistol without a permit.[9]

[9] The amended substitute information filed by the state charged the defendant as follows: "C. ROBERT SATTI, JR., Assistant State's Attorney for the Judicial District of Fairfield, accuses RAUL IVAN DIAZ of MURDER and charges that at the City of Bridgeport, Fairfield County, on the 26th day of June, 1991, at or about 10:00 p.m. at the area of Helen Street and Jane Street, Bridgeport, the said RAUL IVAN DIAZ, with intent to cause the death of one WILLIAM GUISTI, DAVID HECTOR GONZALEZ, VALERIE FALCON, or JUNIOR GONZALEZ, did shoot at another person and cause the death of the said WILLIAM GUISTI, in violation of Section 53a-54a (a) of the Connecticut General Statutes.

"AND SAID STATE'S ATTORNEY FURTHER ACCUSES the said RAUL IVAN DIAZ with the crime of ATTEMPTED MURDER and charges that at the City of Bridgeport, Fairfield County, on the 26th day of June, 1991, at or about 10:00 p.m. at the area of Helen Street and Jane Street, Bridgeport, the said RAUL IVAN DIAZ, with intent to cause the death of DAVID HECTOR GONZALEZ, did shoot at, and attempt to cause the death of one DAVID HECTOR GONZALEZ, in violation of Section 53a-49 and Section 53a-54a (a) of the Connecticut General Statutes.

"AND SAID STATE'S ATTORNEY FURTHER CHARGES the said RAUL IVAN DIAZ with the crime of ATTEMPTED MURDER and charges that at the City of Bridgeport, Fairfield County, on the 26th day of June, 1991, at or about 10:00 p.m. at the area of Helen Street and Jane Street, Bridgeport, the said RAUL IVAN DIAZ, with intent to cause the death of VALERIE FALCON, did shoot at, and attempt to cause the death of the said VALERIE FALCON, in violation of Section 53a-49 and Section 53a-54a (a) of the Connecticut General Statutes.

"AND SAID STATE'S ATTORNEY FURTHER ACCUSES the said RAUL IVAN DIAZ with the crime of CARRYING A PISTOL ON [HIS] PERSON WITHOUT A PERMIT and charges that at the City of Bridgeport, Fairfield County, on the 26th day of June, 1991, at or about 10:00 p.m. at the area of Helen Street and Jane Street, Bridgeport, the said RAUL IVAN DIAZ did carry on his person a pistol, without a legal permit therefor, and not being within his dwelling house or place of business, in violation of Section 29-35 (a) of the Connecticut General Statutes.

"AND SAID STATE'S ATTORNEY FURTHER ACCUSES the said RAUL IVAN DIAZ with the crime of CONSPIRACY and charges that on or about June 26, 1991, exact date unknown, at Bridgeport, Milford, and other places unknown, the said RAUL IVAN DIAZ, with intent that conduct constituting the crime of Murder, in violation of Section 53a-54a (a) be performed, agreed with Geraldo Torres a/k/a Nuno, Edgar (last name unknown), and others unknown, and there was committed one or more of the following overt acts in the performance of such conspiracy:

"1. Possession of various firearms at the area of Helen Street and Jane Street, Bridgeport, on June 26, 1991, at or about 10:00 p.m. by Raul Ivan

At the conclusion of the evidentiary portion of the trial, the court instructed the jury on the law governing each of the counts. The jury thereafter found the defendant guilty as charged. On appeal, the defendant challenges the propriety of several of the trial court's jury instructions, as well as the introduction into evidence of certain testimony used by the state to impeach several defense witnesses and the sufficiency of the evidence on the murder, conspiracy to commit murder and attempted murder counts. We reject each of the defendant's claims.

I

The defendant first claims that the trial court's jury instruction under the *Pinkerton* doctrine[10] was

Diaz; Geraldo Torres a/k/a Nuno, Edgar (last name unknown), and others unknown.

"2. The firing of said firearms at a Ford Bronco with William Guisti, David Hector Gonzalez, Valerie Falcon and Junior Gonzalez in said vehicle on June 26, 1991, at or about 10:00 p.m. at the area of Helen Street and Jane Street, Bridgeport.

"3. Causing the death of William Guisti on June 26, 1991, at the area of Helen Street and Jane Street, Bridgeport.

"4. The flight from the area of Helen Street and Jane Street, Bridgeport, on June 26, 1991, at or about 10:00 p.m. by Raul Ivan Diaz; Geraldo Torres a/k/a Nuno; Edgar (last name unknown), and others unknown.

"In violation of Section 53a-48 of the Connecticut General Statutes."

[10] The trial court gave the following instruction regarding *Pinkerton* liability: "Before I go on to explain the fifth count of conspiracy, there is an additional instruction regarding the charges of murder and attempted murder.

"The defendant is charged with the crime of conspiracy to commit murder. If you should conclude that the crime of murder was committed but that the defendant was not the specific individual to do the killing, there is an additional step in your deliberations. There is a doctrine in the law that provides that once a defendant's participation in a conspiracy is established he is responsible for each of the criminal acts of the other coconspirators which is within the scope of and in furtherance of the conspiracy. This means in this case that if you conclude that the defendant is, in fact, guilty of conspiracy to commit murder, as I will define that for you later, but that he did not kill William Guisti, Jr., then you must determine whether sufficient evidence has been provided to show you beyond a reasonable doubt that

improper because: (1) the instruction was broader than the principle of vicarious liability adopted by this court in *State* v. *Walton*, 227 Conn. 32, 630 A.2d 990 (1993); (2) it was inconsistent with our penal code; (3) application of the *Pinkerton* doctrine to this case violated the constitutional prohibition against ex post facto laws and, in addition, violated the defendant's due process right to fair notice of the conduct proscribed by our murder statute; (4) the state's failure to rely on a theory of vicarious liability at the hearing in probable cause barred it from doing so at trial; and (5) the trial court improperly instructed the jury that it could apply the *Pinkerton* doctrine to the inchoate crime of attempted murder. We address each of these claims in turn.

A

In *Pinkerton* v. *United States*, supra, 328 U.S. 647–48, the United States Supreme Court concluded that under the federal common law, a conspirator may be held liable for criminal offenses committed by a coconspirator if those offenses are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy. In *State* v. *Walton*, supra, 227 Conn. 32, we were required to decide whether to recognize the *Pinkerton* doctrine for purposes of our state criminal law. We concluded, first, that *Pinkerton* liability is not inconsistent with our penal code and, therefore, that

another member of the same conspiracy did in fact commit the crime of murder as I have defined that for you.

"If such other member of the conspiracy did commit the crime of murder and if that murder was in the scope of and in furtherance of the conspiracy of which you have . . . concluded that the defendant was a member, then the defendant would be guilty of murder. If you conclude that the defendant was a member of the conspiracy, as charged in the fifth count of the information, beyond a reasonable doubt and that the murder was within the scope of and in furtherance of this conspiracy, then each and every member of that conspiracy would be guilty of the murder charged, whether or not they personally committed the murder."

we were not prohibited from recognizing that theory of criminal liability as a matter of state common law. See General Statutes § 53-4.[11] Without foreclosing the use of the *Pinkerton* doctrine in other circumstances, we then concluded that application of the doctrine was appropriate in *Walton,* in which the defendant was a leader of the conspiracy, the offense for which vicarious liability was sought to be imposed was an object of the conspiracy and the offense was proved by one or more of the overt acts alleged in support of the conspiracy charge. *State* v. *Walton,* supra, 44–46, 50–51.[12] We now must decide whether to extend the principle of vicarious liability that we adopted in *Walton* to a case in which not all of these conditions have been met, a question that we expressly reserved in *Walton.* See id., 46 n.12. Subject to the limitations set forth hereinafter, we conclude that *Pinkerton* liability may be imposed even if none of the three *Walton* conditions is present.

In adopting the principle of vicarious liability set forth in *Pinkerton* v. *United States,* supra, 328 U.S. 640, we noted in *Walton* that *"Pinkerton* liability is now a recognized part of federal criminal conspiracy jurisprudence"; *State* v. *Walton,* supra, 227 Conn. 43; and that the *Pinkerton* doctrine has been adopted by the majority of state jurisdictions that have considered the issue. Id., 44. In so doing, we rejected the defendant's claim that the doctrine necessarily casts too wide a net of vicarious criminal liability. "Though it is sometimes mischaracterized, *Pinkerton* [liability] is not a broad principle of vicarious liability that imposes criminal responsibility upon every co-conspirator for whatever

---

[11] General Statutes § 53a-4 provides: "Saving clause. The provisions of this chapter shall not be construed as precluding any court from recognizing other principles of criminal liability or other defenses not inconsistent with such provisions."

[12] In *Walton,* we approved the use of the *Pinkerton* doctrine in the case of a drug trafficker who was directing and controlling a drug selling and distributing operation.

substantive offenses any of their confederates commit. On the contrary, in the very decision in which the principle was articulated, co-conspirator liability was carefully confined to substantive offenses that are (a) committed in furtherance of the conspiracy, and (b) reasonably foresee[able] by the co-conspirator sought to be held responsible as a necessary or natural consequence of the unlawful agreement." (Internal quotation marks omitted.) *United States* v. *Jordan,* 927 F.2d 53, 56 (2d Cir.), cert. denied, 501 U.S. 1210, 111 S. Ct. 2811, 115 L. Ed. 2d 983 (1991).

Thus, "the rationale of *Pinkerton* liability . . . is essentially that, because the conspirator played a necessary part in setting in motion a discrete course of criminal conduct, he should be held responsible, within appropriate limits, for the crimes committed as a natural and probable result of that course of conduct. 'A conspiracy is a partnership in crime.' *Pinkerton* v. *United States,* supra, [328 U.S.] 644. Each such partner 'instigated the commission of the crime,' and '[t]he unlawful agreement contemplated precisely what was done. It was formed for the purpose. The act was done in execution of the enterprise. The rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on the same principle. That principle is recognized in the law of conspiracy when the overt act of one partner in crime is attributable to all. An overt act is an essential ingredient of the crime of conspiracy . . . . If that can be supplied by the act of one conspirator, we fail to see why the same or other acts in furtherance of the conspiracy are likewise not attributable to the others for the purpose of holding them responsible for the substantive offense.' Id., 647." *State* v. *Walton,* supra, 227 Conn. 46.

Furthermore, "application of the *Pinkerton* principle to a homicide committed in furtherance of a conspiracy has long been part of our jurisprudence. See, e.g., *State*

v. *Young*, 191 Conn. 636, 642, 469 A.2d 1189 (1983); *State* v. *McCarthy*, 133 Conn. 171, 173, 49 A.2d 594 (1946); *State* v. *Rossi*, 132 Conn. 39, 44, 42 A.2d 354 (1945)." *State* v. *Walton*, supra, 227 Conn. 50–51. Indeed, even prior to *Pinkerton*, we had employed a rule of vicarious criminal liability under which a coconspirator could be held liable for a murder if that crime was the "natural and probable consequence" of a common plan and was committed "while acting in pursuance of, or in furtherance of, the common design." (Internal quotation marks omitted.) *State* v. *Cots*, 126 Conn. 48, 59, 9 A.2d 138 (1939).

Under the facts of this case, we see no reason why it was improper for the trial court to have instructed the jury regarding the principle of vicarious liability enunciated in *Pinkerton*. Although the state did not prove that the defendant was the leader of the conspiracy to ambush the Gonzalez vehicle and its occupants, the evidence reasonably established that the defendant was a fully engaged member of the conspiracy who had actively participated in the shooting and that he, along with his coconspirators, intended to kill one or more of the vehicle's passengers. Thus, in circumstances where, as here, the defendant was a full partner in the illicit venture and the coconspirator conduct for which the state has sought to hold him responsible was integral to the achievement of the conspiracy's objectives, the defendant cannot reasonably complain that it is unfair to hold him vicariously liable, under the *Pinkerton* doctrine, for such criminal conduct.

As we acknowledged in *Walton*, however, the *Pinkerton* doctrine has been criticized, principally on the basis that the criminal "law would lose all sense of just proportion if one might, by virtue of his one crime of conspiracy, be held accountable for thousands of additional offenses of which . . . he did not influence at all." (Internal quotation marks omitted.) *State* v. *Walton*,

supra, 227 Conn. 51. Thus, as we also indicated in *Walton*, there may be occasions when it would be unreasonable to hold a defendant criminally liable for offenses committed by his coconspirators even though the state has demonstrated technical compliance with the *Pinkerton* rule. Id. For example, a factual scenario may be envisioned in which the nexus between the defendant's role in the conspiracy and the illegal conduct of a coconspirator is so attenuated or remote, notwithstanding the fact that the latter's actions were a natural consequence of the unlawful agreement, that it would be unjust to hold the defendant responsible for the criminal conduct of his coconspirator. In such a case, a *Pinkerton* charge would not be appropriate. As we have explained, however, we are not presented with such a situation in this case. Because we continue to believe that the *Pinkerton* doctrine, when properly applied, is consistent with our penal code, we reiterate our approval of the doctrine for those cases in which the state can establish that its use would be fair and reasonable in light of the nature of the conspiracy, the defendant's participation therein, and the relationship between the defendant's role in the conspiracy and the coconspirators' conduct for which the state seeks to hold the defendant accountable. Accordingly, we reject the defendant's claim that the trial court improperly instructed the jury on *Pinkerton* liability.

## B

The defendant next claims that *Pinkerton* liability is inconsistent with our penal code because it allows a jury to convict a defendant of murder even though the defendant did not himself have the specific intent to cause the death of another as required under § 53a-54a (a). He asserts that our felony murder statute, General Statutes § 53a-54c,[13] sets forth an exclusive list of con-

[13] General Statutes § 53a-54c provides in relevant part: "Felony murder. A person is guilty of murder when, acting either alone or with one or more

duct for which a defendant may be convicted of murder without having the intent to kill as required under § 53a-54a (a). We disagree. The defendant's argument fails to account for an important distinction between felony murder liability and *Pinkerton* liability. A defendant may be convicted of felony murder for a death caused by himself or another when the death occurs during the commission of one of a number of specified felonies, even if neither the defendant nor his confederate had any intent to kill. Under the *Pinkerton* doctrine, however, a defendant may not be convicted of murder unless one of his criminal associates, acting foreseeably and in furtherance of the conspiracy, caused the victim's death with the intent to do so. Accordingly, the principle of vicarious liability articulated in *Pinkerton* does not impermissibly intrude upon the province of the felony murder statute.

## C

The defendant's final three arguments regarding *Pinkerton* liability require little discussion. The defendant first contends that application of the *Pinkerton* doctrine to his case violates the prohibition against ex post facto laws found in article one, § 10, of the United States constitution[14] and his due process right to fair notice of the conduct proscribed by § 53a-54a.[15] This

persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[11] "An ex post facto law has been defined by [the United States Supreme] Court as one 'that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action,' or 'that *aggravates* a *crime*, or makes it *greater* than it was, when committed.' " (Emphasis in original.) *Bouie* v. *Columbia*, 378 U.S. 347, 353, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964).

[15] Under the due process clause of the fourteenth amendment to the federal constitution, a criminal statute must give fair warning of the conduct that

claim is without merit. In approving the trial court's jury instruction on *Pinkerton* liability, we have not created a new criminal offense, nor have we expanded our doctrine of vicarious criminal liability. Rather, as we have earlier noted, application of the *Pinkerton* doctrine to a homicide foreseeably committed in furtherance of a conspiracy is firmly rooted in our jurisprudence.[16]

The defendant next asserts that the trial court should not have instructed the jury on a *Pinkerton* theory of liability because the state did not rely on that doctrine at the hearing in probable cause. This claim, too, must fail. The purpose of a hearing in probable cause is simply to determine whether there is sufficient evidence of the defendant's involvement in the crime charged to allow the state to try the defendant for that offense. We have never suggested that the state's failure to rely on a particular principle of criminal liability at a probable cause hearing bars it from proceeding under that theory at trial when, as here, the charge to which the

---

it prohibits. "The basic principle that a criminal statute must give fair warning of the conduct that it makes a crime has often been recognized by [the United States Supreme] Court. As was said in *United States* v. *Harriss*, 347 U.S. 612, 617, [74 S. Ct. 808, 98 L. Ed. 989 (1954)] '[t]he constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.' " *Bouie* v. *Columbia*, 378 U.S. 347, 350–51, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964). As the United States Supreme Court has also noted, "an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art. I, § 10, of the Constitution forbids." Id., 353.

[16] We note, moreover, that more than seven years prior to the commission of the offenses in this case, the Appellate Court, in *State* v. *Failla*, 1 Conn. App. 524, 528, 473 A.2d 1233 (1984), expressly approved the *Pinkerton* principle of vicarious liability, stating that "[o]nce a defendant's participation in the conspiracy is established, he is responsible for the criminal acts of the other coconspirators within the scope of and in furtherance of the conspiracy. *Pinkerton* v. *United States*, [supra, 328 U.S. 647–48] . . . ." (Citations omitted.)

defendant has been held to answer at trial is the same as that for which a valid determination of probable cause has been made. In the absence of any sound reason to adopt the rule urged by the defendant, we decline to do so.

The defendant's final claim is that the *Pinkerton* principle should not be applicable to inchoate offenses and, therefore, that the trial court improperly instructed the jury that it could find him guilty of attempted murder on the basis of a *Pinkerton* theory of vicarious liability.[17] The defendant, however, has presented no reason, and we know of none, why the commission of an inchoate crime cannot be a reasonably foreseeable consequence of a criminal conspiracy. Furthermore, the defendant does not claim that his coconspirators' crimes of attempted murder were either unforeseeable or not committed in furtherance of the conspiracy, the object of which was to commit murder. Finally, the defendant has not demonstrated why it was unfair or unreasonable to hold him responsible for those inchoate offenses in this case. Accordingly, we reject the defendant's claim.

## II

The defendant next asserts that the trial court's jury instruction on accessory liability under General Statutes § 53a-8[18] violated his rights under the due process

---

[17] The state argues that the trial court's instructions on the *Pinkerton* doctrine can reasonably be construed as allowing the jury to consider that principle only in its deliberations on the murder charge and not on the attempted murder charges. See footnote 10. Because we conclude that the state was entitled to an instruction on *Pinkerton* liability with respect to the attempted murder charges, we need not decide whether the state's characterization of the trial court's instruction is correct.

[18] General Statutes § 53a-8 provides in relevant part: "Criminal liability for acts of another. (a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. . . ."

clause of the fourteenth amendment to the United States constitution. Specifically, he contends that the trial court's reference to common design liability during its instruction on the law of accessory liability was likely to have led the jury to believe that it could find the defendant guilty of murder as an accessory even though he lacked the specific intent to cause the death of another as required under § 53a-54a.[19] Although we agree that the challenged portion of the trial court's instruction was improper, we conclude that there is no reasonable possibility that the jury could have been misled by the erroneous jury charge.

A careful review of the trial court's instructions on murder and accessory liability is necessary to our resolution of the defendant's claim. At the beginning of its jury instruction on murder, the trial court stated: "A person is guilty of murder when with the intent to cause the death of another person he causes the death of such person, or of a third person. This means that the State must prove beyond a reasonable doubt that the defendant intended to cause the death of another person, and that in accordance with that intent, the defendant caused the death of that person or of a third person." The trial court then explained to the jury the elements of the crime of murder, reiterating the requirement that

---

[19] "It is . . . constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged. *State* v. *Williamson*, 206 Conn. 685, 708, 539 A.2d 561 (1988). The due process clause of the fourteenth amendment protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute a crime with which he is charged. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Denby*, 235 Conn. 477, 483–84, 668 A.2d 682 (1995). Accordingly, "the failure to instruct the jury adequately on each essential element of the crime charged may have resulted in a violation of the defendant's due process rights implicating the fairness of his trial. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Anderson*, 212 Conn. 31, 36, 561 A.2d 897 (1989). Thus, an error in the jury charge requires reversal if, in the context of the instructions as a whole, there is a reasonable possibility that the jury was misled by the instructional impropriety in reaching its verdict. Id., 38.

a defendant cannot be convicted of that offense unless he had the intent to kill. At the conclusion of its charge on murder, the court instructed the jury on accessory liability, explaining that "[i]f you are not satisfied beyond a reasonable doubt that the defendant personally participated in the murder, then you must consider whe[ther] he intentionally aided or [abetted] some other person in the commission of the murder in question." The court then proceeded to give a detailed instruction on accessory liability under § 53a-8, concluding as follows: "If you find that a person committed the murder in question, then the next thing you must decide is whether the defendant shared the intent of the person who committed the crime, and I remind you that the intent of which I speak is to kill another person. If you find the defendant, sharing in the intent to kill another person, if any, did one of the five things specified, that is, solicited or requested or commanded or importuned or intentionally aided in the commission of the crime, then he would be guilty of the crime.

"To summarize, then you must find beyond a reasonable doubt the defendant did any one of the five things specified in § 53[a]-8. That he is just as guilty of the crime of murder as though he had committed it, and you should return a verdict of guilty.

"If two or more persons participate in a crime, they are equally responsible although it was the immediate act of one which actually brought the crime about. Participation means not only actively sharing in its final commission, but in doing anything to aid, to assist, to inspire or to encourage the conduct which caused it. *All who join in a common design to commit an unlawful act, the natural and probable consequence of the execution of which involves the contingency of taking human life, are responsible for a homicide committed by one of them while acting in pursuan[ce] of or furtherance of common design.*

"If you find that the State has failed to [prove] beyond a reasonable doubt either or both of the elements of the crime charged, then you must find the defendant not guilty of the crime of murder . . . ." (Emphasis added.) The trial court then proceeded to instruct the jury on lesser included offenses of the crime of murder.

The defendant argues that the emphasized portion of the trial court's instruction allowed the jury to convict the defendant of murder without first finding that he had the intent to kill. We agree with the defendant that the trial court's inclusion of the common design language in its instruction on accessory liability was improper because, when viewed in isolation, that language reasonably may be understood to permit the jury to treat the defendant as an accessory, and therefore be subject to liability as a principal, even though he himself did not act with the requisite intent to kill.[20]

We disagree, however, with the defendant's contention that the trial court's statement regarding common design was likely to have caused the jury to conclude that it could find the defendant guilty of accessory to murder without a predicate finding that the defendant himself had a specific intent to kill. "It is well established that individual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge." (Internal quotation marks omitted.) *State* v. *Cooper*, 227 Conn. 417, 444, 630 A.2d 1043 (1993). "The pertinent test is whether the charge, read in its entirety, fairly presents the case

---

[20] Indeed, the common design language used by the trial court, which is identical to language used by this court in *State* v. *Cots*, supra, 126 Conn. 59, is very similar to the instruction authorized under the *Pinkerton* doctrine, under which the criminal conduct of one coconspirator may be imputed to another even though the latter is unaware of the former's actions. See part I of this opinion. To convict a defendant as an accessory, however, the state must establish that the defendant shared the same intent to cause the death of another as the person who actually committed the killing.

to the jury in such a way that injustice is not done to either party under the established rules of law." (Internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 170, 665 A.2d 63 (1995). Thus, "[t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error." (Citations omitted; internal quotation marks omitted.) *State* v. *Anderson*, 212 Conn. 31, 37, 561 A.2d 897 (1989). Accordingly, "[i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Internal quotation marks omitted.) *State* v. *Lemoine*, 233 Conn. 502, 509, 659 A.2d 1194 (1995).

Contrary to the defendant's claim, the trial court did not instruct the jury on common design liability as an alternate form of accessory liability. Rather, the court's statement regarding common design was simply a part of the court's summary of the principles underlying accessory liability.[21] Furthermore, and most importantly, the trial court forcefully and repeatedly instructed the jury regarding the specific intent necessary to convict the defendant of murder either as a principal or as an accessory.[22] In particular, the court explained to

---

[21] We note that throughout its instructions to the jury, the trial court expressly announced when it was introducing an alternative theory of liability with such language as, "[i]f you are not satisfied . . . that the defendant personally participated in the murder, then you must consider [whether] he intentionally aided or [abetted] some other person . . . ." No such introduction occurred here. Instead, the court's remarks immediately preceding its instruction on common design indicated that it was offering a summary of accessory liability, rather than an alternative or different theory of liability.

[22] The relevant portion of the trial court's instruction on murder and accessory liability for murder is as follows: "In the first count of the information the defendant is charged as follows: C. Robert Satti, Jr., Assistant State's Attorney for the Judicial District of Fairfield, accuses Raul Ivan Diaz of murder, and charges that at the City of Bridgeport, Fairfield County, on the 26th day of June, 1991, at or about 10:00 P.M., in the area of Helen Street

the jury that it could not find the defendant guilty of accessory to murder unless it determined that the

and Jane Street, Bridgeport, the said Raul Ivan Diaz, *with the intent to cause the death* of one William Guisti, David Hector Gonzalez, Valerie Falcon or Junior Gonzalez, did shoot at another person and cause the death of said William Guisti in violation of Section 53a-54a (a) of the Connecticut General Statutes.

"That section insofar as is pertinent to this case reads as follows: A person is guilty of murder when *with the intent to cause the death of another person* he causes the death of such person, or of a third person. This means that the state must prove beyond a reasonable doubt that the defendant *intended to cause the death* of another person, and that *in accordance with that intent*, the defendant caused the death of that person or of a third person.

"In order to convict the defendant of murder, you must find that the defendant caused the death of William Guisti. You must find proved beyond a reasonable doubt that William Guisti died as a result of the actions of the defendant, and I'll explain that to you further in a moment. Next, you must conclude that the person causing the death of the victim did so *with the intent to cause the death.* . . . [A] person acts *intentionally with respect to a result or conduct* described by a statute defining an offense, *when his conscious objective is to cause* such result or engage in such conduct. . . .

"If you find that the state has proven beyond a reasonable doubt that the defendant *had the intent to cause the death of* and that *having the intention to cause the death of* William Guisti the defendant did cause his death, then you may find the defendant guilty of the crime of murder.

"However, consider in your deliberations the following: *An intent to cause death may be inferred* from circumstantial evidence, such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. [O]ne who uses a deadly weapon upon parts of another may be deemed *to have intended the probable result* of that act and from such circumstance a proper inference may be draw[n] in some cases that *there was intent to kill.*

"Please *don't be confused by the word intent. An intent may be formulated in an instant. But you must be convinced beyond a reasonable doubt that the defendant had that intent.*

"It makes no difference whether William Guisti's injuries were actually inflicted by the defendant's firing of a gun or by another gun if the defendant was engaging with others in a common purpose to carry on an activity as I will charge you. He would be guilty of murder and attempted murder if the injury is caused thereby, even though it was not the defendant's gunshot, but that—but was that of another with whom he was acting in con[cert] that caused the death of William Guisti. It is of no consequence that the evidence may not clearly establish that the death of William Guisti was caused by the defendant or an accomplice as I will explain that to you.

defendant "shared the intent of the person who committed the crime" and that the defendant had "a criminality

"If you are not satisfied beyond a reasonable doubt that the defendant personally participated in the murder, then you must consider whe[ther] he intentionally aided or [abetted] some other person in the commission of the murder in question.

"There is a statute, [section] 53a-8 called an accessory statute and it reads as follows: A person acting with the mental state required for commission of an offense who solicits, requests, commands, importunes or intentionally aids another person to engage in the conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principle offender.

"You will note that this section does not connect the five things specified by the word and but separates them by the word or. The state does not have to prove that the person did all five of the things specified. It is sufficient that the state proves any one of the five things specified.

"If the state proves beyond a reasonable doubt that the defendant solicited or requested or commanded or importuned or intentionally aided another person in the commission of the murder, then he is guilty of murder. Under [section] 53a-8, if the defendant did any of the five things specified he is, in the eyes of the law, just as guilty of the crime of murder as though he had directly and personally committed the crime.

"At this point I will briefly define the five terms used in this section: solicit means to [ask] earnestly; request means to ask for or express a desire for; command means to order or direct; importune means to command, urge or incite; and aid means to assist, help or support.

"The law makes all of the following persons guilty of [a] crime: those who actually committed the crime; those who do some act which forms a part of the crime; those who assist in the actual commission of the crime; those who assist in the commission of any act which forms a part of the crime; those who directly or indirectly instigate or encourage or order any part, rather, order any other person to do an act which forms a part of the crime. To find a person guilty of this section, you must find he was more than actively present at the commission of the crime or passively acquiescent in the crime or innocently did acts which, in fact, did aid in the commission of the crime. *To find a person guilty under this section, you must find that he has a criminality of intent and unlawful purpose* in common with the person or persons who actually committed the crime. Whether a person is present at the commission of a crime, aids or [abets] a commission is a question of fact, the answer to which depends on circumstances surrounding his presence and his conduct, both during the commission of the crime and after the commission of the crime.

"If you find that a person committed the murder in question, then the next thing you must decide is *whether the defendant shared the intent of*

of intent and unlawful purpose in common with the person or persons who actually committed the crime." In light of the entire charge—in particular, the two sentences immediately preceding the court's lone reference to common design—it is highly unlikely that the jury understood that reference to be anything other than a restatement of the court's explanation that a person may be convicted of murder as an accessory even though he had not personally killed the victim.

Finally, the trial court began its instructions on the murder charge by explaining that a "person is guilty of murder when with the intent to cause the death of another person he causes the death of such person, or of a third person." At the conclusion of its charge on murder, and immediately after its statement regarding common design, the trial court repeated its admonition that the state was required to prove each of the elements of the offense beyond a reasonable doubt in order to establish the defendant's guilt. This latter instruction

_the person who committed the crime_, and I remind you that _the intent of which I speak is to kill another person._ If you find the defendant, _sharing in the intent to kill another person_, if any, did one of the five things specified, that is, solicited or requested or commanded or importuned or intentionally aided in the commission of the crime, then he would be guilty of the crime.

"To summarize, then you must find beyond a reasonable doubt the defendant did any one of the five things specified in [section] 53[a]-8. That he is just as guilty of the crime of murder as though he had committed it, and you should return a verdict of guilty.

"If two or more persons participate in a crime, they are equally responsible although it was the immediate act of one which actually brought the crime about. Participation means not only actively sharing in its final commission, but in doing anything to aid, to assist, to inspire or to encourage the conduct which caused it. All who join in a common design to commit an unlawful act, the natural and probable consequence of the execution of which involves the contingency of taking human life, are responsible for a homicide committed by one of them while acting in pursuan[ce] of or furtherance of common design.

"If you find that the state has failed to prove beyond a reasonable doubt either or both of the elements of the crime charged, then you must find the defendant not guilty of the crime of murder . . . ." (Emphasis added.)

bolsters our conclusion that the trial court's statement regarding common design, when viewed in the broader context of the trial court's instructions in their entirety, could not reasonably have led the jury to believe that it could find the defendant guilty of murder under an accessory theory without first finding that he had the requisite intent to kill. Accordingly, the defendant is not entitled to a new trial on the ground of instructional impropriety.

## III

The defendant further claims that there was insufficient evidence to sustain his convictions of murder, conspiracy to commit murder and attempted murder on the ground that the state failed to prove beyond a reasonable doubt that he fired at the Bronco with the requisite intent to kill. The defendant also maintains that the evidence was inadequate to support his conviction of murder under an accessory theory of liability. We disagree with each of these claims.

In reviewing the defendant's claims of evidentiary insufficiency, "[w]e apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994). "Ordinarily, intent can only be inferred by circumstantial evidence; it may be and usually is inferred from the defendant's conduct. . . . Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Citation omitted; internal quotation marks omitted.) *State* v. *Raguseo*, 225 Conn. 114, 120, 622 A.2d 519 (1993).

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that there was sufficient evidence that the defendant participated in the ambush with the intent to kill the individuals riding in the Bronco. The defendant and at least four other men armed themselves and proceeded to lie in wait for the Bronco. When the Bronco came into view, the defendant and the others ran out into the street and, as the vehicle proceeded past them, fired up to forty shots at it. The defendant knew that the Bronco contained at least two occupants, Gonzalez and Falcon, who were seated in plain view in the front seat.[23] Moreover, several of the shots were apparently aimed at the passenger compartment, including three that passed through the Bronco's front windshield. Thus, it is reasonable to infer from the manner in which the ambush was conducted, including the number of shots fired and the proximity of the shooters to the Bronco and its passengers, that the defendant and his coconspirators each intended to kill Gonzalez and Falcon.

The defendant argues that it also would have been reasonable, in light of all of the evidence, for a juror to find that the defendant and his companions were firing only at the Bronco and not at its passengers. Even if such a finding might be warranted, it is irrelevant to our resolution of the defendant's claim. In considering whether the evidence fairly supports a jury's finding of guilt, "we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." *State* v. *Sivri*, supra, 231 Conn. 134. Because sufficient evidence supports the conclu-

[23] In light of Guisti's exclamation that there was a child in the Bronco and Torres' response to that statement, the jury fairly could have concluded that Torres, and perhaps one or more of the other assailants, was also aware that there was at least one child seated in the Bronco.

sion that the defendant and his coconspirators discharged their weapons with the intent to kill Gonzalez and Falcon, the defendant's claims of insufficient evidence of intent are without merit.[24]

The defendant also contends that there was insufficient evidence to convict him of murder under an accessory theory of liability because there was inadequate proof that he solicited, requested, commanded, importuned or intentionally aided anyone in the commission of the murder. We disagree. "Since under our law both principals and accessories are treated as principals . . . if the evidence, taken in the light most favorable to sustaining the verdict, establishes that [the defendant] committed the [murder] charged or did some act which forms . . . a part thereof, or directly or indirectly counseled or procured any persons to commit the offenses or do any act forming a part thereof, then the convictions must stand. . . . To prove guilt as a principal, the state must prove each element of the offense charged beyond a reasonable doubt. To be guilty as an accessory one must share the criminal intent and community of unlawful purpose with the perpetrator of the crime and one must knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it." (Citations omitted.) *State* v. *Haskins*, 188 Conn. 432, 465, 450 A.2d 828 (1982).

---

[24] The defendant seeks to buttress his claim of evidentiary insufficiency with the fact that the state adduced no evidence of a motive for the ambush. Although evidence of a motive to kill the Bronco's passengers no doubt would have provided further support for the jury's guilty verdict, the lack of motive evidence is not determinative of whether the defendant had the intent to kill required under the murder statute. Because "[m]otive is not an element of the crime of murder"; (internal quotation marks omitted) *State* v. *Rasmussen*, 225 Conn. 55, 69–70, 621 A.2d 728 (1993); "the state is under no obligation to show a motive for the accused to commit the crime charged." (Internal quotation marks omitted.) *State* v. *Ramsundar*, 204 Conn. 4, 14, 526 A.2d 1311, cert. denied, 484 U.S. 955, 108 S. Ct. 348, 98 L. Ed. 2d 374 (1987). Thus, we will not upset the guilty verdict solely because the state presented no evidence of motive.

Although the evidence did not clearly demonstrate which of the perpetrators actually fired the shot that fatally injured William Guisti, Jr., the evidence did establish that the defendant and his companions together prepared and readied themselves for the ambush by retrieving their weapons and hiding to avoid notice. As the Bronco approached, the men took aim at it and its occupants, firing repeatedly into the vehicle with the intent to kill one or more of the passengers. "If the state's version of the facts is credited, the evidence shows sufficient concert of action between the defendant and his companion[s] to support . . . the accessory allegation . . . ." *State* v. *Baker*, 195 Conn. 598, 604, 489 A.2d 1041 (1985). Accordingly, the defendant's claims of evidentiary insufficiency are without merit.

## IV

The defendant also claims that the trial court improperly instructed the jury that it could infer that the defendant acted with the intent to cause the death of another in light of his use of a deadly weapon, thereby relieving the state of its burden of proof on the element of intent. We are not persuaded.

The trial court gave the following jury instruction regarding the crimes of murder and attempted murder: "An intent to cause death may be inferred from circumstantial evidence, such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. One who uses a deadly weapon upon [vital] parts of another may be deemed to have intended the probable result of that act and from such circumstance a proper inference may be draw[n] in some cases that there was intent to kill." At the conclusion of the court's charge, the defendant commented on the instruction as follows: "[T]he court has given the standard charge on intent as it relates to use of weapons in a homicide.

The defendant isn't objecting to that language; he's just merely asking that the court give the additional instruction that the mere use of [a] weapon is not in and of itself evidence of a specific intent—specific intent to kill . . . ." The trial court noted the defendant's exception but declined to give a supplemental instruction.

The defendant claims that the challenged instruction impermissibly shifted the burden of persuasion on intent to him because the charge directed the jury to presume that he had the intent to kill merely by virtue of his use of a deadly weapon. See *Sandstrom* v. *Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979). The defendant did not raise this claim at trial,[25] but nevertheless seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

"In *Sandstrom* v. *Montana*, supra, [442 U.S.] 517–24, the United States Supreme Court held that a jury instruction that the law presumes that a person intends the ordinary consequences of his voluntary acts violated the defendant's due process rights because a reasonable jury could have interpreted the instruction as a conclusive or burden-shifting presumption and thus relieved the state of its burden of proving every element of the crime. See *Francis* v. *Franklin*, 471 U.S. 307, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985); *United States* v. *United States Gypsum Co.*, 438 U.S. 422, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978); *Mullaney* v. *Wilbur*, 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975) . . . . We have, however, recognized that the rule of *Sandstrom* must not be oversimplified. *State* v. *Mason*, 186 Conn. 574, 582–83, 442 A.2d 1335 (1982); *State* v. *Pina*, 186 Conn. 261, 263, 440 A.2d 967 (1982). *Sandstrom* does not invalidate, for example, the use of an entirely permissive inference or presumption, which allows . . . the ele-

---

[25] Because we conclude that the defendant cannot prevail on this claim, we need not consider the effect of his express disavowal of the claim at trial.

mental fact from proof by the prosecutor of the basic one and that places no burden of any kind on the defendant. *Ulster County Court* v. *Allen*, 442 U.S. 140, 157, 99 S. Ct. 2213, 60 L. Ed. 2d 777 (1979); see *State* v. *Fernandez*, 198 Conn. 1, 20, 501 A.2d 1195 (1985); *State* v. *Arroyo*, 180 Conn. 171, 175, 429 A.2d 457 (1980). A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion. *State* v. *Amarillo*, 198 Conn. 285, 300–302, 503 A.2d 146 (1986); see also *State* v. *Shine*, 193 Conn. 632, 644–45, 479 A.2d 218 (1984); *State* v. *Johnson*, 185 Conn. 163, 167–69, 440 A.2d 858 (1981), aff'd, 460 U.S. 73, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983); *State* v. *Vasquez*, 182 Conn. 242, 246–48, 438 A.2d 424 (1980). *State* v. *Palmer*, 206 Conn. 40, 47–48, 536 A.2d 936 (1988)." (Internal quotation marks omitted.) *State* v. *Cooper*, supra, 227 Conn. 443.

The defendant cannot prevail on his claim of a *Sandstrom* violation because that portion of the charge to which the defendant objects did not shift the burden of establishing intent as the defendant asserts. The trial court instructed the jury that one *"may be deemed* to have intended the probable result" of the use of a deadly weapon on a vital body part and, further, that "from such circumstance a proper inference *may be draw[n] in some cases* that there was intent to kill." (Emphasis added.) This instruction did nothing more than apprise the jury that it was *permitted* to draw an inference regarding the defendant's intent from the evidence adduced at trial; the charge did nothing either to dilute the state's burden of proof or to place any burden on the defendant. Moreover, the trial court prefaced its instruction with the statement that "[a]n intent to cause death *may be inferred* from circumstantial evidence." (Emphasis added.) In light of the permissive language used by the trial court, there is no possibility that a

rational juror could have concluded that he or she was required to draw the inference, by virtue of the defendant's use of a deadly weapon, that the defendant intended to cause the death of another person.

The defendant also claims that the trial court improperly refused his request to instruct the jury that the use of a deadly weapon is alone insufficient to establish that he had the intent to kill. He maintains that the trial court was required to give the requested charge in order to ameliorate the harm flowing from the improper instruction on intent. Because we have rejected the defendant's *Sandstrom* claim, this claim must also fail.

V

Finally, the defendant contends that the trial court improperly allowed the state to impeach certain defense witnesses on a collateral matter. Although we agree that the trial court should not have allowed the challenged testimony into evidence, we conclude that its admission was harmless.

During the defendant's case-in-chief, several witnesses provided alibi testimony that when the shooting took place, the defendant was at a bar known as Como's Cafe, located at 418 Main Street in Bridgeport. One of those witnesses, Jesus DeJesus, further testified that, at the time of the shooting, he was the owner of Como's Cafe. On cross-examination, DeJesus indicated that he was not the permittee of the bar and that he had not been responsible for filing the necessary legal documents with the state department of liquor control (department). Several other witnesses also testified that they were at Como's Cafe on the night of the shooting and that they, too, observed the defendant there. Each also testified that DeJesus was the owner of the bar and that it was called Como's Cafe.

In its rebuttal case, the state elicited testimony from Kyle Anderson, an agent for the department, for the

purpose of impeaching the defendant's alibi witnesses. Anderson stated that the liquor permit on file with the department indicated that the establishment located at 418 Main Street in Bridgeport was named Danny's Cafe and that it was owned by Umberto Perez and Jose Lebron. The defendant objected to Anderson's testimony, claiming that it was collateral and, therefore, improper impeachment evidence. The trial court overruled the defendant's objection on the ground that Anderson's testimony was not collateral.

"A witness may not be impeached by contradicting his or her testimony as to collateral matters, that is, matters that are not directly relevant and material to the merits of the case." *State* v. *Negron*, 221 Conn. 315, 327, 603 A.2d 1138 (1992). "The determination of whether a matter is relevant or collateral . . . generally rests within the sound discretion of the trial court." *State* v. *Colton*, 227 Conn. 231, 248, 630 A.2d 577 (1993).

We conclude that the trial court improperly allowed the state to elicit Anderson's testimony regarding the name and ownership of the establishment located at 418 Main Street in Bridgeport. The sole purpose of Anderson's testimony was to establish that DeJesus was not the owner of the bar and that its name was not Como's Cafe, facts that were not material to whether the defendant was present at the bar at the time of the shooting.[26]

Because the admission into evidence of the improper impeachment testimony did not violate the defendant's constitutional rights,[27] the defendant bears the burden of demonstrating that its admission was harmful. See *State* v. *Moody*, 214 Conn. 616, 629, 573 A.2d 716 (1990). Thus, the defendant is entitled to a new trial on this

---

[26] A different conclusion would be warranted if, for example, the state's rebuttal evidence indicated that there was no bar located at that address.

[27] The defendant does not claim, nor could he establish, a violation of constitutional magnitude.

ground only if he can establish that it is more probable than not that the jury's verdict was affected by the error. Id. We are satisfied that Anderson's testimony had no effect on the jury's verdict.

First, Anderson's testimony did not establish that the testimony of any of the alibi witnesses was not credible. Anderson stated only that, at the time of the most recent permit renewal application, the trade name on the liquor permit was Danny's Cafe and that DeJesus was not listed as an owner. His testimony did not preclude the possibility that the bar was known by a name other than its registered name or that DeJesus had an ownership interest in the bar at the time of the shooting. Moreover, even if the jurors were to have concluded, on the basis of Anderson's testimony, that the defense witnesses were not to be believed concerning the name and ownership of the bar, the issue was of such marginal significance to the case that it is unlikely to have adversely affected the jury's view of the overall credibility of the witnesses. Finally, the alibi witnesses' accounts of the events at the bar on the night of the shooting were so riddled with inconsistencies that their testimony regarding the bar's name and ownership was insignificant by comparison. We conclude, therefore, that Anderson's testimony could not have influenced the jury's verdict and, therefore, was harmless.

The judgment is affirmed.

In this opinion PETERS, C. J., and CALLAHAN and KATZ, Js., concurred.

BERDON, J., concurring. Although I continue to believe that we should not have adopted *Pinkerton*[1] liability under the Connecticut Penal Code; *State* v. *Walton*, 227 Conn. 32, 68, 630 A.2d 990 (1993) (*Berdon,*

---

[1] *Pinkerton* v. *United States,* 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946).

*J.*, dissenting); I must now accept this form of criminal liability as the law of this state.[2] With this caveat stated, I agree with the court that the trial court did not commit reversible error.

---

[2] There are some matters, however, that I could never accept as our law under the doctrine of stare decisis because they are contrary to the fundamental tenets of justice. See, e.g., *State* v. *Ross*, 230 Conn. 183, 286, 646 A.2d 1318 (1994), cert. denied, U.S. , 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995) (*Berdon, J.*, dissenting) (death penalty violates state constitution's prohibition against cruel and unusual punishment).