911 A.2d 1099 (2007)
289 Conn. 779
STATE of Connecticut
v.
Ramon LOPEZ.
No. 17198.
Supreme Court of Connecticut.
Argued September 20, 2006.
Decided January 2, 2007.
*1106 Kent Drager, senior assistant public defender, for the appellant (defendant).
Rita M. Shair, senior assistant state's attorney, with whom were Jonathan C. Benedict, state's attorney, and, on the brief, C. Robert Satti, Jr., senior assistant state's attorney, for the appellee (state).
BORDEN, NORCOTT, KATZ, PALMER and ZARELLA, Js.
BORDEN, J.
The defendant, Ramon Lopez, appeals[1] from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a(a),[2] two counts of attempted murder in violation of General Statutes §§ 53a-49(a)[3] and 53a-54a(a), and two counts of assault in the first degree in violation of General Statutes § 53a-59(a)(5).[4] The defendant claims that the trial court improperly: (1) denied his postconviction motion for a continuance so that his substitute counsel could review the trial transcript in preparation for sentencing; (2) admitted evidence of the defendant's prior misconduct; and (3) instructed the jury on accessorial liability. In addition, the defendant claims that the prosecutor engaged in numerous acts of misconduct, thereby depriving him of his right to a fair trial, and that there was insufficient evidence to establish his guilt beyond a reasonable doubt on any of the charges. We affirm the judgment of the trial court.
The jury reasonably could have found the following facts. In the early morning hours of February 2, 2002, several people were gathered inside and outside of Pettway's Variety Store (Pettway's) at the northwest corner of the intersection of Stratford Avenue and Fifth Street in Bridgeport. Stratford Avenue runs in a generally east-west direction and has one-way traffic heading east. Fifth Street runs in a generally north-south direction and ends at Stratford Avenue. The three victims, Shariff Abdul-Hakeem, also known as "Polo," his brother, Manuel Rosado, and Gary Burton, were standing outside the store. Lou Diamond and a man known as "Chef" came out of Pettway's, gave Abdul-Hakeem and Rosado a "grim" look and then walked north on Fifth Street. Shortly thereafter, Diamond and Chef, who had covered the lower parts of their faces with some type of cloths, turned around and walked back down Fifth Street toward Pettway's. At the same time, a third unidentified person carrying a gun ran from the east side of Fifth *1107 Street to the west side and joined Diamond and Chef.
Meanwhile, a white car had come down Fourth Street, the next street to the west of Fifth Street, turned east onto Stratford Avenue and stopped on the north side of that street. Two men got out of the rear driver's side door and the car then crossed Stratford Avenue and parked on the south side of the street. Although two men wore cloths over their lower faces, an eyewitness, Tony Payton, knew both men and was able to identify them as Boo McClain and the defendant. McClain carried a handgun and the defendant carried a shotgun.[5] As McClain and the defendant approached Pettway's, the defendant said to the people gathered on the sidewalk, "All right freeze, nobody move," and he cocked the shotgun. The people on the sidewalk then rushed toward and started banging on the door to Pettway's, which had a "buzzer lock." The door opened and several people were able to get inside the store. Rosado, who was standing outside the store facing Fifth Street, turned toward Fourth Street to see the reason for the commotion. He saw the defendant, whom he had known for about one year before the shooting and with whom he had been incarcerated, aiming a gun at him. As Rosado dove for the door to Pettway's, McClain, the defendant and the three men who were approaching Pettway's down Fifth Street opened fire on the crowd. After the shooting, the defendant yelled, "I told you I was going to get you, Polo, I told you I was going to get you." McClain and the defendant then ran back up Stratford Avenue and reentered the white car, which turned around and sped back up Fourth Street. At the same time, Diamond and Chef ran back up Fifth Street. A later ballistics analysis revealed that two separate shotguns and four separate handguns had been used in the shooting.
Abdul-Hakeem received bullet wounds in his left calf and left buttock. The bullet that hit his left buttock exited from the right side of his abdomen, and Abdul-Hakeem died several hours after the shooting as the result of uncontrollable bleeding from the wound. Rosado received shotgun wounds to his legs. Burton was wounded when a bullet hit him in the ribs and another bullet grazed his hip. Additional facts will be set forth as necessary.
The defendant was charged with the murder of Abdul-Hakeem, the attempted murder of Rosado and Burton, and assault in the first degree with respect to Rosado and Burton. He was found guilty of all charges after a jury trial. After the verdict, the defendant filed a motion to dismiss his trial counsel on the ground that counsel had failed to perform his duties properly. On November 10, 2003, the trial court granted the motion and appointed new counsel for the defendant. On that date, the trial court also rescheduled the sentencing hearing from November 14, 2003, to December 12, 2003.
On November 14, 2003, substitute counsel for the defendant filed a motion for a continuance of the sentencing hearing until February 6, 2004, so that he could review the trial transcript, which was not going to be available until January 20, 2004. In the motion, defense counsel stated that he needed to review the transcript in order to address the defendant's complaints against his trial counsel. The trial court held a hearing on the motion, at which defense counsel argued that he needed to review the transcript in order to determine whether he should file a motion for a new trial. When the trial court responded that *1108 the time for filing a motion for a new trial had passed,[6] the defendant argued that the court could grant a request to file an untimely motion. The trial court then stated that the purpose of a sentencing hearing was not to review the adequacy of trial counsel. Rather, the court stated, "[t]he purpose of a sentencing hearing is to allow the parties to be heard with respect to what constitutes an appropriate sentence . . . based on factors, including the circumstances of the offense, the attitude of the victim [in] the case of a homicide, the family, and the history of [the defendant], including the social and criminal background." The court further noted that the presentencing investigation report would be available to counsel and that he could discuss all relevant matters with the victim's advocate and the defendant. The court concluded that, although "a transcript of the trial may be necessary on appeal of [the defendant's] conviction or for a proceeding before a habeas court, it is not necessary for effective representation of [the defendant] at a sentencing hearing." Accordingly, the trial court denied the defendant's motion for a continuance.
Thereafter, the trial court rendered judgment in accordance with the verdict and sentenced the defendant to sixty years imprisonment on the murder charge, twenty years imprisonment on the attempted murder charges, and twenty years imprisonment on the assault in the first degree charges, for a total effective sentence of 100 years imprisonment. This direct appeal followed.

I
The defendant first claims that the trial court improperly denied his motion for a continuance of the sentencing hearing. He contends that, by doing so, the court effectively deprived him of his constitutional right to counsel during critical postverdict proceedings and, therefore, he is entitled to a new sentencing hearing. We conclude that there is no need to decide whether the trial court abused its discretion in denying the defendant's motion for a continuance because, even if the denial was improper, it was harmless. We further conclude that the defendant was not deprived of his constitutional right to counsel.
"It is well settled that [t]he determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. . . . A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . Our role as an appellate court is not to substitute our judgment for that of a trial court that has chosen one of many reasonable alternatives. . . . Therefore, on appeal, we . . . must determine whether the trial court's decision denying the request for a continuance was arbitrary or unreasonabl[e]." (Citations omitted; internal quotation marks omitted.) State v. Delgado, 261 Conn. 708, 711, 805 A.2d 705 (2002).
"We have identified several factors that a trial court may consider when exercising its discretion in granting or denying a motion for continuance. . . . These factors include the likely length of the delay . . . the impact of delay on the litigants, witnesses, opposing counsel and the court . . . the perceived legitimacy of the reasons proffered in support of the request . . . [and] the likelihood that the denial would substantially impair the defendant's ability *1109 to defend himself. . . ." (Citation omitted; internal quotation marks omitted.) Id., at 714, 805 A.2d 705.
"A sentencing judge has very broad discretion in imposing any sentence within the statutory limits and in exercising that discretion he may and should consider matters that would not be admissible at trial." (Internal quotation marks omitted.) State v. Eric M., 271 Conn. 641, 649, 858 A.2d 767 (2004). "Consistent with due process the trial court may consider responsible unsworn or out-of-court information relative to the circumstances of the crime and to the convicted person's life and circumstance." (Internal quotation marks omitted.) Id., at 649-50, 858 A.2d 767.
In the present case, the defendant requested a continuance of approximately three months. As we have indicated, the reason proffered for the continuance was that the newly appointed defense counsel needed to review the trial transcript in order to determine whether there were legitimate grounds for a motion for a new trial. In addition, the defendant now claims that the continuance was required so that defense counsel could review the facts and circumstances of the crime and the weight of the evidence against the defendant to determine whether those considerations militated in favor of a light sentence.
We agree with the defendant that, when new defense counsel has been appointed after trial and before sentencing, the trial court, as a general rule, should allow counsel an opportunity to review the trial transcript before holding a sentencing hearing. See State v. Brodene, 493 N.W.2d 793, 795 (Iowa 1992) (failure to provide new counsel with trial transcript before sentencing was improper); 26 J. Moore, Federal Practice (3d Ed.1997) § 632.10[2][b], p. 632-50 ("[i]f a defendant's request for new counsel is granted, the court should postpone sentencing until counsel has had an opportunity to review the transcript of the trial"); see also People v. Stark, 23 Cal.App.4th 1059, 1083, 11 Cal.Rptr.2d 207 (1992) (trial court properly denied request to discharge counsel just prior to sentencing because lengthy delay would have been required to allow new counsel to review trial transcript); Blake v. State, 273 Ga. 447, 449, 542 S.E.2d 492 (2001) (same).[7] We conclude, however, that in the present case there is no need to determine whether the trial court abused its discretion in denying the motion for a continuance on the basis of the record before it because, even if it did, the defendant has made no claim that he was prejudiced in any way by the denial. See United States v. Sullivan, 694 F.2d 1348, 1349 (2d Cir.1982) (per curiam) (trial court improperly denied defendant's application for adjournment of sentencing hearing until new counsel could review trial transcript, but impropriety was harmless in absence of specific claim of prejudice). With respect to any preserved claims of evidentiary error or prosecutorial misconduct that the defendant could have raised in a motion for a new trial if defense *1110 counsel had had the opportunity to review the trial transcript, he may raise those claims in this appeal.[8] Other courts have held that the ability to raise claims on appeal that could not be raised in a motion for a new trial because of lack of access to a trial transcript renders the denial of access harmless. See State v. Brodene, supra, at 795;[9] see also State v. Washington, 275 Kan. 644, 677, 68 P.3d 134 (2003). Moreover, the defendant has not identified any arguments that defense counsel would have made at the sentencing hearing if the trial transcript had been available to him.[10] See United States v. Sullivan, supra, at 1349; see also State v. Washington, supra, at 677, 68 P.3d 134 (trial court properly denied new counsel opportunity to review trial transcript before sentencing when defendant was not prejudiced by denial). It is clear, therefore, that any impropriety was harmless.
The defendant claims, however, that the trial court's denial of his motion for a continuance constituted effective deprivation of counsel at a critical stage of the proceeding and was structural error, precluding harmless error analysis. In support of this argument, the defendant points out that defendants have a constitutional *1111 right to be represented by counsel at all critical stages of criminal proceedings, including the sentencing stage; see Consiglio v. Warden, 153 Conn. 673, 675-76, 220 A.2d 269 (1966); and that the complete denial of counsel at a critical stage constitutes structural error and is not susceptible to harmless error analysis. See Neder v. United States, 527 U.S. 1, 8-9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). Cases involving structural error "contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. . . . Such errors infect the entire trial process . . . and necessarily render a trial fundamentally unfair. . . . Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." (Citations omitted; internal quotation marks omitted.) Id.
As we have indicated, however, courts in other jurisdictions have concluded that a denial of a continuance under these circumstances may be harmless if the defendant has made no specific claim of prejudice; see United States v. Sullivan, supra, 694 F.2d at 1348; see also State v. Washington, supra, 275 Kan. at 677, 68 P.3d 134;[11] and the defendant *1112 has cited no specific authority for his argument to the contrary. We agree with these courts that, although review of the trial transcript generally is an important component of new counsel's preparation for sentencing, a denial of the opportunity to do so does not rise to the level of complete denial of counsel[12] and does not necessarily render the entire process fundamentally unfair. Moreover, the effect of the impropriety on the outcome of the proceeding may be readily ascertained after the fact. Cf. State v. Murray, 254 Conn. 472, 499, 757 A.2d 578 (2000) (improper substitution of alternate juror after deliberations have begun is structural error because reviewing court cannot assess effect of impropriety on outcome of trial). Accordingly, we reject the defendant's claim that the improper denial of a continuance under these circumstances constitutes structural error "affecting the framework within which the trial proceeds. . . ." (Internal quotation marks omitted.) Neder v. United States, supra, 527 U.S. at 8, 119 S.Ct. 1827. Rather, it is "simply an error in the trial process itself"; (internal quotation marks omitted) id.; which does not require reversal if it reasonably could not have materially affected the outcome of the proceeding.

II
The defendant next claims that the trial court improperly admitted evidence that he previously had threatened Robert Payton, who was at Pettway's at the time of the shooting. The defendant contends that this evidence of prior misconduct improperly was admitted to suggest that the defendant had a bad character and a propensity for criminal behavior. We disagree.
The following additional facts and procedural history are relevant to this claim. During Rosado's testimony at trial, the prosecutor asked that the jury be excused so that he could make an offer of proof with respect to testimony about the defendant's prior misconduct. After the jury was excused, the prosecutor indicated that, two to three weeks before the shooting, Rosado had witnessed a confrontation between the defendant and Robert Payton. The prosecutor argued that Rosado's testimony about the confrontation was relevant to the defendant's identity and his motive. The defendant argued that the prejudicial value of the testimony outweighed its probative value and that it was irrelevant because there was no evidence that Payton had been an intended victim. The court allowed the evidence.
After the jury returned to the courtroom, Rosado testified that he had been at Pettway's two to three weeks before the shooting. As Rosado approached the store, he saw the defendant, who was holding a gun, and Robert Payton. They appeared to be having an argument. As Rosado entered the store, he held the door open for Payton. The defendant turned to Rosado and, gesturing with the gun, said, "[W]hat, you want this too?" The defendant was wearing a green army camouflage jacket and brown Timberland boots.
Rosado further testified that, on the night of February 2, 2002, shortly before the shooting, he had seen Robert Payton get out of a van that had driven down and parked on Fifth Street. Rosado walked over to the van and Payton asked him if he had a gun, because "Chef and them are out here." When the shooting started moments later, Payton was inside the store. *1113 Rosado testified that, when he had seen the defendant that night, he was again wearing a green camouflage jacket and brown Timberland boots.
"The rules governing the admissibility of evidence of a criminal defendant's prior misconduct are well established.[13] Although evidence of prior unconnected crimes is inadmissible to demonstrate the defendant's bad character or to suggest that the defendant has a propensity for criminal behavior . . . such evidence may be admissible for other purposes, such as to prove knowledge, intent, motive, and common scheme or design, if the trial court determines, in the exercise of judicial discretion, that the probative value of the evidence outweighs its prejudicial tendency. . . . That evidence tends to prove the commission of other crimes by the accused does not render it inadmissible if it is otherwise relevant and material. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) State v. Ellis, 270 Conn. 337, 354-55, 852 A.2d 676 (2004).
"It is not essential that the state prove a motive for a crime. . . . But it strengthens its case when an adequate motive can be shown." (Citation omitted.) State v. Hoyeson, 154 Conn. 302, 307, 224 A.2d 735 (1966). Evidence of prior misconduct that tends to show that the defendant harbored hostility toward the intended victim of a violent crime is admissible to establish motive. Id.; see also State v. Camera, 81 Conn.App. 175, 184, 839 A.2d 613, cert. denied, 268 Conn. 910, 845 A.2d 412 (2004).
In the present case, Rosado's testimony that, two to three weeks before the shooting, the defendant had had an angry confrontation with Robert Payton during which he displayed a gun, and that he also threatened Rosado with the gun, tended to show that the defendant harbored hostility toward Payton and Rosado. This evidence of the defendant's hostility toward Payton and Rosado was bolstered by Rosado's testimony that, moments before the shooting, Payton had asked him whether he had a gun, because "Chef and them are out here," together with the evidence suggesting that Chef and the defendant were acting in concert that night. (Emphasis added.) We conclude, therefore, that Rosado's testimony was admissible on the issue of motive.
The defendant claims, however, that, even if he was hostile to Robert Payton, and even if it is assumed that he was one of the shooters,[14] the evidence was inadmissible because there was no evidence to support a finding that he had any intent to kill or injure Payton. He points out that Rosado testified that Payton had been inside Pettway's when the shooting *1114 had started and there was no evidence that any of the shooters had attempted to shoot Payton personally. We are not persuaded. Rosado's testimony established that the shooters converged toward the corner and started shooting at the crowd gathered outside Pettway's within moments of Payton's arrival. The fact that Payton managed to get inside the store before the shooters reached the corner and fired their guns does not preclude a finding that he was an intended victim. The jury reasonably could have inferred that, in the darkness and confusion, the shooters did not know that Payton was no longer in the line of fire or, even if they did, that he was not the only intended victim. As we have indicated, the jury reasonably could have inferred from the defendant's statement to Rosado, "[W]hat, you want this too," that the defendant was also hostile to Rosado, who was shot during the attack.[15]
The defendant also claims that the evidence should have been excluded because it was more prejudicial than probative. In support of this argument he contends that "the prosecutor, engaging in blatant misconduct, argued to [the jury] that the armed threat evidence showed the kind of person the defendant was and that his criminal propensities could be used in finding the defendant guilty as charged."[16] We do not agree with this characterization of the prosecutor's argument to the jury. Rather, the prosecutor argued that Rosado's eyewitness identification of the defendant at the scene of the shooting was not the only evidence that the defendant was the shooter because the evidence also showed that the defendant had a motive to kill Robert Payton and Rosado. Accordingly, we reject this claim.
Because we conclude that the trial court did not abuse its discretion in admitting Rosado's testimony about the confrontation between the defendant and Robert Payton as evidence of motive, we need not address the defendant's claims that the evidence was inadmissible to establish the defendant's identity and intent.

*1115 III
The defendant next raises several unpreserved claims of prosecutorial misconduct that he claims deprived him of his due process right to a fair trial. He claims that the prosecutor improperly: (1) elicited testimony from Tony Payton suggesting that his brother, Robert Payton, had been killed as a result of the prosecution of this case; (2) elicited testimony from Tony Payton suggesting that he was in danger from the defendant because he had agreed to testify in this case; (3) argued facts not in evidence when he argued to the jury that the fact that five eyewitnesses did not identify the defendant as a shooter did not exclude him as a shooter; and (4) vouched for the credibility and veracity of Tony Payton and Rosado. We conclude that the prosecutor did not engage in any acts of misconduct.
"[I]n analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question. . . .
"[I]n cases involving incidents of prosecutorial misconduct that were not objected to at trial . . . it is unnecessary for the defendant to seek to prevail under the specific requirements of State v. Golding, 213 Conn. 233, 239-40, 567 A.2d 823 (1989),[17] and, similarly, it is unnecessary for a reviewing court to apply the four-prong Golding test. The reason for this is that the touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in State v. Williams, 204 Conn. 523, 540, 529 A.2d 653 (1987). As we stated in that case: In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citation omitted; internal quotation marks omitted.) State v. Stevenson, 269 Conn. 563, 572-73, 849 A.2d 626 (2004).
Although unpreserved claims of prosecutorial conduct are reviewable under Williams, it is "the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made *1116 suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time. . . . Moreover as the Appellate Court has observed, defense counsel may elect not to object to arguments that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to it or because he or she wants to later refute that argument. . . . Accordingly, we emphasize that counsel's failure to object at trial, while not by itself fatal to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error. . . . Put differently . . . prosecutorial misconduct claims [are] not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, to address gross prosecutorial improprieties that . . . have deprived a criminal defendant of his right to a fair trial." (Citations omitted; internal quotation marks omitted.) Id., at 576, 849 A.2d 626.

A
We first address the defendant's claim that the prosecutor improperly elicited testimony from Tony Payton that his brother had been killed as a result of the prosecution of this case. The following additional facts and procedural history are relevant to this claim. The prosecutor asked Tony Payton whether it was his testimony that Robert Payton, was at the scene of the shooting on February 2, 2002. Tony Payton responded in the affirmative. The prosecutor then asked Tony Payton whether Robert Payton was still alive and Tony Payton responded, "No, he's deceased because of this case." The prosecutor then stated, "I just want to know if he's alive or not, no need to explain, thank you." The defendant did not object to the question or to the response and did not ask the trial court for a limiting instruction.
The defendant now claims that the prosecutor improperly elicited Tony Payton's statement and that it constituted improper evidence of bad character and criminal propensity. Specifically, he claims that the jury could have inferred from Tony Payton's statement that the defendant had murdered Robert Payton. We disagree. Although it is not entirely clear from the context of this exchange why the prosecutor asked Tony Payton whether Robert Payton was still alive, it is reasonable to conclude that he was attempting to forestall any speculation by the jury or comments by the defendant as to the reasons for the state's failure to call Robert Payton as a witness. See State v. Malave, 250 Conn. 722, 740, 737 A.2d 442 (1999) (party may comment on opposing party's failure to call witness during closing argument), cert. denied, 528 U.S. 1170, 120 S.Ct. 1195, 145 L.Ed.2d 1099 (2000). The prosecutor's question was not posed in such a way as to necessarily elicit Tony Payton's comment that his brother's death was connected to this case and the prosecutor immediately diminished the effect of that response by stating that no explanation for his death was required. Moreover, because Tony Payton did not specify the particular manner of his brother's death, it would have been pure conjecture for the jury to infer from his ambiguous statement that the defendant had caused Robert Payton's death. Accordingly, we conclude that this incident did not constitute prosecutorial misconduct.

B
The defendant also claims that the prosecutor improperly elicited testimony from Tony Payton that he feared retaliation by the defendant and his friends as a result of testifying in this case. The following additional facts and procedural history are relevant to this claim. On cross-examination, Payton testified that he did *1117 not tell the police what he knew about the shooting until June, 2002, when he was taken into federal custody on charges unrelated to this case. During redirect examination, outside the presence of the jury, the prosecutor indicated that he wanted to question Payton about the reasons that he did not come forward earlier, including his general fear of retaliation for cooperating with the police. The trial court allowed the testimony, on the condition that the prosecutor would not attempt to insinuate that Payton's fear of testifying was directly connected to the defendant.
When redirect examination of Tony Payton resumed, the prosecutor asked him if concern for his safety was the reason for his failure to cooperate with the police in their investigation of this case in the months after the shooting. Payton responded that it was. The prosecutor then asked him whether he had talked to any of his fellow inmates about his cooperation with the state in this case after he had been taken into federal custody in June, 2002. Payton stated that he had not. The prosecutor then asked, "And would you just explain that generally, please?" Payton stated, "Because, you know, anybody you know you tell something like that, maybe word would get out, some of his friends or friends' friends might want to try to do something." The defendant did not object to the prosecutor's question or to the response.
The defendant now claims that, by asking the defendant why he had not spoken to his fellow inmates about his cooperation with the state in this case, the prosecutor violated the trial court's order that he avoid any suggestion that Tony Payton's fear of testifying was directly connected to the defendant. He contends that the jury must have understood Payton's response to mean that the defendant or friends acting on the defendant's behalf intended to retaliate against him. We disagree. The prosecutor carefully asked Payton to explain generally his reluctance to talk to fellow inmates about his cooperation with the state, and could not have anticipated a response specifically related to the defendant. In any event, Payton's response was nonspecific. The defendant does not dispute that, after defense counsel had attempted to impeach Payton's testimony on the ground that he did not give a statement to police until months after the shooting, the prosecutor was entitled to elicit testimony about his general fear of cooperating in a criminal investigation. Nor does he dispute that, as a general matter, incarcerated witnesses are reluctant to cooperate in an investigation both because there is a widespread antipathy toward "snitches" in prison and because there is a widespread belief that the associates of the specific subject of the investigation might retaliate against the "snitch." There was no suggestion that the defendant in the present case or his associates had, in fact, threatened Payton. Rather, Payton stated that if word got out that a person was giving information in an investigation against "anybody," then "his"i.e., "anybody's"friends, might retaliate. Accordingly, we reject this claim.

C
We next address the defendant's claim that the prosecutor improperly commented on facts not in evidence when he stated during closing argument to the jury that the fact that five of the seven eyewitnesses could not specifically identify the defendant as one of the shooters did not exclude the defendant as a shooter. The following facts and procedural history are relevant to this claim. During closing argument, the prosecutor pointed out that seven eyewitnesses to the shooting had testified during trial, and only two of them had identified the defendant as one of the shooters. The prosecutor then asked, *1118 "But did they ever exclude him? Did they ever exclude him in court? Did they ever stand up on the witness stand and say that man over there is not the one I saw that night? Didn't do that." During rebuttal, the prosecutor again referred to "[t]he witnesses who did not exclude the defendant. Who didn't sit in this courtroom and say, that's not the man over there." The defendant did not object to the prosecutor's comments.
"Counsel may comment upon facts properly in evidence and upon reasonable inferences to be drawn from them. . . . Counsel may not, however, comment on or suggest an inference from facts not in evidence." (Citation omitted; internal quotation marks omitted.) State v. Prioleau, 235 Conn. 274, 320, 664 A.2d 743 (1995).
The defendant claims that, because the prosecutor never asked the five witnesses who had failed to identify the defendant as the shooter whether they could exclude the defendant as one of the shooters, he improperly relied on facts not in evidence in arguing that the witnesses had not excluded the defendant as a shooter. We disagree. The prosecutor merely commented that the actual state of the evidence did not preclude a conclusion that the defendant had been a shooter. Put another way, the prosecutor did not rely on a fact not in evidence when he drew the jury's attention to the fact that the testimony of the witnesses who could not specifically identify the defendant was not inconsistent with the testimony of the two witnesses who did identify him. Because the jury reasonably could have made that inference on its own, it was not misconduct for the prosecutor to point it out. Accordingly, we reject this claim.

D
We next address the defendant's claim that the prosecutor improperly vouched for the credibility and veracity of Tony Payton and Rosado when he told the jury that the government would punish them if they committed perjury. The following additional facts and procedural history are relevant to this claim. Payton testified at trial that he had made a plea deal with federal prosecutors that required him to cooperate with the state in this case in exchange for the possibility of a reduced sentence on pending federal charges. He also testified that, under the plea agreement, if he committed perjury in this case, he could receive additional jail time in the federal case. The defendant did not object to the admission of this testimony. Rosado testified at trial that there were a number of federal charges pending against him, but that he had not entered into any plea agreement with the federal government.
During closing argument, the prosecutor argued that Tony Payton would receive the benefit of his plea agreement only if he testified truthfully and that, if he lied, he could receive additional time in prison.[18] He also argued that Rosado's pending charges provided an incentive for him to *1119 testify truthfully. The defendant did not object to the prosecutor's comments.
"The prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony. . . . These expressions of opinion are particularly difficult for the jury to ignore because of the special position held by the prosecutor. . . . The jury is aware that he has prepared and presented the case and consequently, may have access to matters not in evidence . . . which the jury may infer to have precipitated the personal opinions." (Citations omitted.) State v. Williams, supra, 204 Conn. at 541-44, 529 A.2d 653. "While the prosecutor is permitted to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses." State v. Oehman, 212 Conn. 325, 336, 562 A.2d 493 (1989).
The defendant claims that the prosecutor improperly suggested that the government would know if Tony Payton and Rosado were lying and had vouched for their credibility and veracity when he argued to the jury that, if they lied, they might receive more severe sentences in the cases pending against them. We disagree. First, the defendant makes no claim that the trial court improperly admitted Payton's testimony about the provisions of the plea agreement requiring him to be truthful.[19] If that evidence was admissible for the purpose of rebutting the defendant's suggestion that the pending charges against him provided an incentive for him to testify in favor of the state, then the prosecutor's argument to the jury that it could make that inference could not be improper. See State v. Rowe, 279 Conn. 139, 152, 900 A.2d 1276 (2006). Second, the prosecutor did not suggest to the jury that he had personal knowledge that the witnesses had not lied. Cf. State v. Payne, 260 Conn. 446, 454, 797 A.2d 1088 *1120 (2002) (prosecutor improperly vouched for credibility of witness when, on basis of personal knowledge of facts not in evidence, he directly contradicted testimony that state wanted witness to lie). Nor did he suggest that the government had means of determining whether the witnesses were lying that were unavailable to the jurors. Rather, he left the ultimate evaluation of the witnesses' credibility to the jury. Accordingly, we reject this claim.

IV
The defendant next claims that there was insufficient evidence to establish his guilt beyond a reasonable doubt on any of the charges. Specifically, he claims that the evidence was insufficient to establish: (1) his identity as one of the shooters; (2) that he had injured or attempted to kill Burton; (3) that he had injured or attempted to kill Rosado; and (4) that he had killed or intended to kill Abdul-Hakeem. We disagree.
The following additional procedural history is relevant to this claim. At the close of evidence, the defendant made a motion for acquittal on the ground that, reviewing the evidence in the light most favorable to the state, a reasonable juror could not conclude that the defendant was guilty beyond a reasonable doubt of any of the charges. The defendant specifically argued that the circumstances under which Rosado had cooperated with the state's investigation of this matter rendered his testimony unreliable. The state argued that Rosado's credibility was an issue for the jury. The trial court concluded that the jury reasonably could find the defendant guilty beyond a reasonable doubt on each of the five counts of the information and denied the motion for acquittal.
"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .
"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .
"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .
"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable *1121 doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) State v. Gary, 273 Conn. 393, 405-406, 869 A.2d 1236 (2005); see also State v. Morgan, 274 Conn. 790, 800, 877 A.2d 739 (2005) ("[W]e do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." [Internal quotation marks omitted.]).

A
We first address the defendant's claim that there was insufficient evidence to establish his identity as one of the shooters. Specifically, the defendant claims that Rosado's identification of the defendant as the shooter was unreliable because: Rosado had seen the shooter whom he identified as the defendant for only two or three seconds; the shooter had been masked; Rosado told the police on the night of the shooting that he did not recognize any of the shooters; Rosado changed his story only after talking to another witness; and Rosado's identification was based only on his belief that the defendant was "the kind of guy he associated with guns and shooting" and on the fact that the defendant wore the same type of clothes as the shooter. The defendant also claims that Tony Payton's identification of the defendant was unreliable because Payton admitted that he had learned the shooters' names from another person after the shooting;[20] the evidence showed that Payton had been too far away from the shooting to see clearly and his view had been blocked by a utility pole;[21] and Payton testified that he had seen the defendant shoot Abdul-Hakeem in the chest with a shotgun, which did not happen.
"[W]hen determining whether a witness had sufficient time to observe a defendant to ensure a reliable identification, we have stated that a good hard look will pass muster even if it occurs during a fleeting glance. . . . In particular, we have recognized that a view of even a few seconds *1122 may be sufficient for a witness to make an identification . . . and that it is for the trier of fact to determine the weight to be given that identification." (Citations omitted; internal quotation marks omitted.) State v. Morgan, supra, 274 Conn. at 801-802, 877 A.2d 739.
We conclude that the evidence was sufficient to support the conclusion beyond a reasonable doubt that the defendant was one of the shooters. As we have indicated, Rosado testified that he had known the defendant for about one year before the shooting and had been incarcerated with him. In addition, he had seen the defendant two weeks before the shooting, at which time the defendant was wearing the same clothes as on the night of the shooting. Under these circumstances, the jury reasonably could have concluded that a look lasting a few seconds was sufficient for Rosado to ascertain the defendant's identity, even though the defendant was masked from the nose down. The fact that Rosado did not identify the defendant immediately after the shooting does not affect our conclusion. The jury reasonably could have concluded that Rosado was afraid of retaliation. In addition, Rosado testified that he did not come forward immediately because he was afraid that his presence during the shooting would constitute a violation of parole, and that he gave a statement to the police within one or two days of the shooting after his parole officer assured him that there would be no violation if he did nothing wrong.
Moreover, the jury was not compelled to credit the defendant's evidence that Tony Payton had been too far away from the shooting to see clearly and that his view had been blocked, rather than Payton's testimony that he was able to see the defendant. We also reject the defendant's claim that Payton's testimony was unreliable because he had been told the shooters' names after the shooting. The evidence showed only that Payton did not know the defendant's name at the time of the shooting, not that he was unable to recognize him.
Finally, we are not persuaded by the defendant's argument that Tony Payton had no credibility because his testimony that the defendant had shot Abdul-Hakeem in the chest was inconsistent with evidence that Abdul-Hakeem had not received a shotgun injury, but had been killed by a bullet wound to his left buttock. The evidence showed that shotgun pellets were removed from the back of Abdul-Hakeem's leather jacket by the pathologist during an autopsy. Thus, there was only a minor inconsistency in the evidence, which reasonably could be explained by the frightening, fast moving and chaotic nature of the incident. Accordingly, we reject this claim.

B
We next address the defendant's claim that the evidence was insufficient to establish that he intentionally had injured or attempted to kill Burton. The following facts and procedural history are relevant to this claim. Burton testified that he had grown up and gone to high school in Bridgeport but now lived in New Britain. On the evening of February 2, 2002, he went with Desiree Jones and Keaga Johnson to a bar in Bridgeport called Barons. At the bar he met several high school friends, Francisco Soares, John Soares and "Little Jay." At some point, Burton and the others decided to leave Barons and go to a club called GQ's, and to stop on the way at Pettway's for cigarettes. Burton drove in his car with Jones and Johnson, and Francisco Soares, John Soares and Little Jay drove in a van. Burton parked his car on the south side of Stratford Avenue across from Pettway's and the van parked on the west side of Fifth Street *1123 next to Pettway's. Burton then went into Pettway's with Francisco Soares. Tony Payton testified that he saw his brother, Robert Payton, get out of the van with Francisco Soares, who was a friend of Robert Payton's. Burton saw three or four men outside of Pettway's whom he recognized from the street, but he did not know their names. Burton left the store before Francisco Soares and waited for him on the corner. He then heard someone say, "[D]on't nobody move." He turned west toward Fourth Street to see who was talking and saw three men approaching. One of the men reached into his jacket and pulled out a shotgun. The other two men carried handguns. The next thing that Burton remembered was falling to the ground. He then heard eight to ten shots. He felt a sharp pain on the left side of his chest and thought that he might have fallen on a rock. After the shooting stopped, he got up and walked back to his car. As he walked he heard Jones, who had moved into the driver's seat of the car, and others around him saying that he had been shot. Burton checked himself and discovered that he was bleeding. He then got into the car and told Jones how to get to the nearest hospital. At the hospital, Burton was told that a bullet had fractured one of his ribs and that a second bullet had grazed his hip. He was in the hospital for two days and stayed home from work for about one month.
During closing argument, defense counsel argued that the evidence had established that Burton was "an innocent victim, an innocent bystander and had no axe to grind with any of these people because he didn't know them well enough." The prosecutor stated that the defendant was "[f]iring at the area of Rosado, [Robert] Payton and [Abdul-Hakeem]," and that "Burton got caught in the crossfire." At the sentencing hearing, the prosecutor argued that the defendant had "the purpose of shooting specific individuals . . . one being the murder victim [Abdul-Hakeem], and the other being . . . Rosado." He further argued that "the injury to . . . Burton was occasioned by the fact that this defendant along with the others were firing at the individuals, and he was an innocent individual who was struck."
The defendant claims that, on the basis of the evidence presented at trial, the jury reasonably could not have found that the defendant injured or attempted to kill Burton. He argues that there was no evidence that Burton's injuries were caused by a bullet rather than "things like shards of cement or glass." He further argues that the evidence was insufficient to establish that the defendant actually had injured Burton or intended to kill him.[22] We are not persuaded.
The defendant's claim that the evidence was insufficient to establish beyond a reasonable doubt that Burton had been wounded by a bullet requires little discussion. Burton testified unequivocally that he had received and had been treated for two bullet wounds, and the defendant has provided no authority for the proposition that expert medical testimony is required under these circumstances. Accordingly, we reject this claim.
The defendant's claim that the evidence did not establish that he had the requisite intent for intentional assault or attempted murder requires a lengthier *1124 analysis. "A verdict of guilty of attempted murder requires a finding of the specific intent to cause death. See General Statutes §§ 53a-49, 53a-54a and 53a-3(11). A verdict of guilty of assault in the first degree in violation of § 53a-59(a)(5) . . . requires a finding of the specific intent to cause physical injury. See General Statutes §§ 53a-59(a)(5) and 53a-3(3). . . ." (Citation omitted.) State v. Murray, 254 Conn. 472, 479, 757 A.2d 578 (2000). "Because direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Citation omitted; internal quotation marks omitted.) State v. Gary, supra, 273 Conn. at 407, 869 A.2d 1236.
We conclude that the evidence was sufficient to support a conviction of attempted murder. The evidence showed that the defendant was hostile toward Robert Payton and that that hostility extended to Payton's associates. The evidence also showed that, on the night of the shooting, Burton was associating with a group of people that included Payton. The defendant and the other shooters drew their weapons, pointed them at Burton and the others standing outside of Pettway's and fired. We conclude that, on the basis of this evidence, the jury reasonably could have found beyond a reasonable doubt that the defendant intended to kill Burton.[23] Indeed, although defense counsel characterized Burton as an "innocent bystander" in closing arguments, he never argued to the jury or to the trial court that there was insufficient evidence to support a finding that the defendant intended to kill Burton. Instead, defense counsel focused almost exclusively on the defendant's claim that the evidence was insufficient to establish that he was one of the shooters.
The foregoing analysis also establishes that the jury reasonably could have found that the defendant had the intent to cause physical injury to Burton. See State v. Murray, supra, 254 Conn. at 483, 757 A.2d 578 ("one cannot intend to cause death without necessarily intending to cause a physical injury"). Even if we were to assume that the evidence did not establish that the defendant directly had injured Burton, the jury reasonably could have found him guilty as an accessory pursuant to General Statutes § 53a-8.[24] Accordingly, we conclude that the evidence was sufficient to support a conviction of intentional assault.
We recognize that the prosecutor argued to the jury that "Burton got caught in the crossfire," and, at the sentencing hearing, the prosecutor characterized Burton as an "innocent" victim of the attack on Abdul-Hakeem and Rosado. Those statements, however, are not necessarily *1125 inconsistent with a finding that the defendant intended to kill Burton. The jury reasonably could have concluded that, although Burton was "innocent" in the sense that he had done nothing to provoke the attack and the defendant had no preexisting hostility toward him, Burton's appearance at Pettway's with Robert Payton, Rosado and Abdul-Hakeem on the night of the shooting provided a reason for the defendant to form an intent to kill him. Moreover, even if we were to assume that the prosecutor ultimately came to believe that Burton was an unintended victim, that view of the evidence was not the only reasonable one.[25] The trial court instructed the jury that arguments and statements by the attorneys were not evidence and that, "[i]f the facts as [the jurors] remember them differ from the way the lawyers have stated them, your memory of them controls." The court also instructed the jury that, to find the defendant guilty of attempted murder, it must find that he "had the intent to cause the death of . . . Burton. . . ." "In the absence of any indication to the contrary, we presume that the jury followed the court's instruction[s]." (Internal quotation marks omitted.) State v. Alston, 272 Conn. 432, 446, 862 A.2d 817 (2005). Accordingly, we reject this claim.

C
We next address the defendant's claim that the evidence was insufficient to support his convictions of intentional assault and attempted murder with respect to Rosado. The following additional facts and procedural history are relevant to this claim. Rosado testified that, when he saw the defendant "aiming [his gun] towards [him]," he ran for the door of Pettway's. He further testified that, as he ran, "I got hit in my right leg. When I got hit in my right leg, it spun me around. When it spun me around, I got hit in my back leg and dove in the store." The first shot hit Rosado below his right knee, and the second shot hit him in his left calf. When the shooting stopped, Francisco Soares and "Kenny"[26] pulled Rosado out of Pettway's and laid him on the sidewalk in front of the store. Rosado was taken to the hospital by ambulance. The ambulance personnel cleaned his wounds and gave him pain medication. Rosado was taken to the emergency room and was released four or five hours later.
The defendant claims that this evidence was insufficient to establish that Rosado was injured by a firearm and not in some other manner, such as being stepped on during the general rush to the door of Pettway's, or to establish that the defendant intended to injure or kill Rosado. As with the previous claim, the defendant's claim that Rosado did not suffer a gunshot wound is easily disposed of. Rosado's unequivocal testimony that he was shot, that ambulance personnel cleaned his wounds *1126 and treated him for pain, and that he was in the hospital for four or five hours, was sufficient to support a finding beyond a reasonable doubt that he was wounded by gunfire. To the extent that the defendant claims that Rosado's testimony should not have been credited, he had every opportunity at trial to explore whether something other than a bullet had caused the injuries.
We also reject the defendant's claim that the fact that, although the shooters had "the full opportunity to kill anyone they wanted to kill,"[27] Rosado was not wounded in a vital body part and apparently was hit by "the outer edge of a shotgun spray" establishes that the defendant did not aim at Rosado and, therefore, precludes a finding beyond a reasonable doubt that the defendant intended to injure or kill Rosado. We rejected a virtually identical claimraised by the same defense counselin our recent decision in State v. Gary, supra, 273 Conn. at 411, 869 A.2d 1236 (fact that defendant did not shoot intended victim did not preclude jury from finding that defendant had aimed gun at intended victim and had intended to kill him). As we noted in Gary, the fact that the defendant did not kill, or, in that case, even injure, his intended victim did not preclude the jury from finding an intent to kill. Id. The evidence in the present case showed that the defendant had a motive to kill Rosado, aimed a shotgun at him and fired. We conclude that this evidence was sufficient to support a finding beyond a reasonable doubt that the defendant had intended to kill Rosado.

D
We next address the defendant's claim that there was insufficient evidence to support his conviction of murder. Specifically, the defendant claims that there was insufficient evidence to support a finding that the defendant or the other shooters had intended to kill Abdul-Kareem because, although, according to one witness, the defendant had the opportunity to kill whomever he wanted to kill, the gunshot wound to Abdul-Kareem's left buttock did not kill him immediately and it did not appear to be a fatal wound. The defendant does not identify the evidence on which he relies in support of his claim that Abdul-Hakeem "did not even appear to be seriously hurt" when the shooters left the scene.[28] Even if we were to assume the accuracy of that account, however, we are not persuaded.
The defendant engages yet again in the faulty logic that, because the jury may infer intent to kill from conduct designed to ensure that the intended victim actually was dead, the jury may not infer intent to kill if the intended victim was alive when the defendant left the scene, regardless of the other circumstances of the crime. Nothing in our case law governing sufficiency of the evidence claims related to mental states supports such a conclusion. The evidence in the present case established that the defendant aimed his shotgun at Abdul-Hakeem and fired it; shotgun pellets penetrated Abdul-Hakeem's leather jacket; the defendant yelled, "I told you I was going to get you, Polo, I told you I was going to get you"; the *1127 defendant was acting in concert with the other shooters, one or more of whom shot Abdul-Hakeem twice; and Abdul-Hakeem ultimately died of the wound to his left buttock. This evidence was more than sufficient to support a finding beyond a reasonable doubt that the defendant and his confederates intended to kill Abdul-Hakeem. Accordingly, we reject this claim.

V
The defendant next claims that the trial court improperly instructed the jury on the principles of accessory liability pursuant to § 53a-8. Specifically, he contends that the trial court's inclusion of language pertaining to theories of joint criminal enterprise[29] and conspiracy[30] in its jury instructions was improper because it had allowed the jury to find the defendant guilty as an accessory without finding that he had the intent required for commission of the substantive offense. See State v. Diaz, 237 Conn. 518, 536, 679 A.2d 902 (1996) (inclusion of common design language in instruction on accessory liability for murder was improper because state is not required to prove specific intent to kill under common design theory); see also State v. Martinez, 278 Conn. 598, 611-19, 900 A.2d 485 (2006) (accessorial liability and conspiracy are distinct theories of criminal liability).
The following additional procedural history is relevant to this claim. During its charge to the jury, the trial court read the text of § 53a-8. See footnote 24 of this opinion. The court then gave the following instructions: "If a person did any of those things specified in [§ 53a-8], he is, in the eyes of the law, just as guilty of the crime charged as though he had directly committed it or directly participated in its commission. Everyone is a party to a crime who actually does some act forming part of it or who assists in its actual commission or the commission of any part of it or who directly or indirectly counsels or procures anyone to commit the crime or to do any act which is a part of it. If there is a joint criminal enterprise, each party to it is criminally responsible for all acts done in furtherance of it." (Emphasis added.) Shortly thereafter, the court instructed the jury that "[w]here accessory liability is charged, it is not necessary that the state prove the identity of the actual perpetrator, as long as to such person the state proves all the elements of the crime charged. In order to find a person who is an accessory under the statute, it is not necessary to show agreement in words or writing, but such an agreement may be inferred from all the circumstances. Whether someone who is present at the commission of a crime is an accessory to it depends on the circumstances surrounding his presence and his conduct while there." (Emphasis added.) The defendant challenges the emphasized portions of the jury charge.
The defendant concedes that this claim was not preserved, but contends that he should prevail under State v. Golding, supra, 213 Conn. at 239-40, 567 A.2d 823. *1128 Because the record is adequate for review, and because the claim implicates the defendant's due process right to a fair trial; see State v. Anderson, 212 Conn. 31, 36, 561 A.2d 897 (1989) ("the failure to instruct the jury adequately on each essential element of the crime charged may [result] in a violation of the defendant's due process rights implicating the fairness of his [or her] trial" [internal quotation marks omitted]); we review the claim.[31] We conclude, however, that he cannot prevail on the claim.
"Our standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rule of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Citations omitted; internal quotation marks omitted.) State v. Floyd, 253 Conn. 700, 714, 756 A.2d 799 (2000).
We agree with the defendant in the present case that the trial court should not have included in its instructions language pertaining to theories of conspiracy and joint criminal enterprise when the defendant was charged only as a principal or an accessory. As in State v. Diaz, supra, 237 Conn. at 536-37, 679 A.2d 902, however, we conclude that, although the trial court's instructions were improper, they reasonably could not have misled the jury and were harmless beyond a reasonable doubt. The trial court repeatedly and forcefully instructed the jury that, in order to convict the defendant as an accessory, it must find that the defendant acted with the intent required for the commission of the crime.[32] Although the court used some language derived from principles governing joint criminal enterprise and conspiracy, it never suggested to the jury that, under those theories, the jury *1129 was not required to find that the defendant had the criminal intent required by the substantive offenses with which he was charged. Thus, there was no reasonable possibility that the jury was misled to believe that, if it found that the defendant had entered into a criminal agreement with his confederates or was engaged in a joint criminal enterprise, there was no need for it to find that he had the criminal intent required for murder, attempted murder or assault. If anything, the court's instructions may have made it more difficult for the jury to convict the defendant by suggesting that, in addition to finding that the defendant had the specific intent to commit the offenses, the jury had to find that he had entered into an agreement or a joint criminal enterprise with his confederates. Accordingly, we reject this claim.
The judgment is affirmed.
In this opinion the other justices concurred.
NOTES
[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199(b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years. . . ."
[2] General Statutes § 53a-54a(a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person. . . ."
[3] General Statutes § 53a-49(a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."
[4] General Statutes § 53a-59(a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."
[5] Burton testified that he had seen three men approaching Pettway's from the direction of Fourth Street, one of whom carried a shotgun and two of whom carried handguns.
[6] Practice Book § 42-54 provides: "Unless otherwise permitted by the judicial authority in the interests of justice, a motion for a new trial shall be made within five days after a verdict or finding of guilty or within any further time the judicial authority allows during the five-day period."
[7] But see United States v. Butz, 517 F.Supp. 1167, 1169 (S.D.N.Y.1981) (when trial transcript was not available at sentencing but new counsel had sufficient information to be familiar with case, and sentencing court promised to correct sentence if transcript proved helpful, court did not abuse discretion in holding sentencing hearing before transcript could be prepared); State v. Washington, 275 Kan. 644, 677-80, 68 P.3d 134 (2003) (trial court properly denied new counsel opportunity to review trial transcript before sentencing when defendant could raise claims of trial error on appeal and new counsel had other sources for relevant information, but case was remanded for new sentencing hearing because new counsel's lack of knowledge of statutory provisions governing sentencing at sentencing hearing constituted ineffective assistance of counsel).
[8] With respect to any unpreserved claims of error that the defendant claims he would have raised in a motion for a new trial, it is well established that a motion for a new trial is not the proper vehicle for raising new, unpreserved claims of error. See State v. Whipper, 258 Conn. 229, 244, 780 A.2d 53 (2001), overruled in part on other grounds by State v. Cruz, 269 Conn. 97, 848 A.2d 445 (2004); State v. Gebhardt, 83 Conn.App. 772, 780-81, 851 A.2d 391 (2004). Accordingly, new counsel for the defendant properly could not have raised such claims in a motion for a new trial even if the continuance had been granted.
[9] The court in Brodene stated that "[a]ny error in not providing [a trial transcript] can be ignored . . . because a transcript was later furnished in connection with this appeal. We can cure any error, and do so, by excusing the new counsel from any preservation of error requirements in preparing and presenting the posttrial motions." State v. Brodene, supra, 493 N.W.2d at 795. Under our practice, claims of evidentiary error and prosecutorial misconduct, like those raised by the defendant in the present case, may be raised on appeal if they were raised during trial regardless of whether they were raised again in a motion for a new trial. Accordingly, there is no need for this court to excuse the failure to raise the claims in a motion for a new trial. Any such claims that were not raised during trial could not have been raised in a motion for a new trial. See footnote 8 of this opinion.
[10] To establish harm, a defendant could show that the trial transcript contained information that was otherwise unavailable to the defendant or his counsel that would have allowed counsel to argue that the sentencing information provided by the government was inaccurate and that the sentencing court relied on this inaccurate information; United States v. Katalinich, 113 F.3d 1475, 1484 (7th Cir. 1997); that the defendant was a minor participant in the crime; United States v. Beltran, 109 F.3d 365, 370 (7th Cir.), cert. denied, 522 U.S. 852, 118 S.Ct. 145, 139 L.Ed.2d 92 (1997); that the defendant was remorseful; see United States v. Leasure, 122 F.3d 837, 840-41 (9th Cir.1997), cert. denied, 522 U.S. 1065, 118 S.Ct. 731, 139 L.Ed.2d 668 (1998); that the defendant had been candid with the government; see United States v. Ming He, 94 F.3d 782, 795 (2d Cir.1996); or that the defendant had a mental disease or defect that, although it did not excuse the crime, justified a reduced sentence. See State v. Washington, supra, 275 Kan. at 678, 68 P.3d 134. We do not suggest that this list is exclusive.

The defendant in the present case states in his brief that the prosecutor made "several substantial factual errors" in his summation of the evidence at the sentencing hearing that "were not noted by new defense counsel, because he did not know that they were errors." The defendant further states that page limitations on the brief prevented him from identifying any of these errors but, in any event, there was no need to do so because the denial of the motion for a continuance was structural error and not susceptible to harmless error review. Accordingly, we conclude the defendant has abandoned this claim of prejudice.
[11] See also United States v. Stevens, 223 F.3d 239, 244 (3d Cir.2000) (structural errors at sentencing involve "`very limited class of cases'" including "deprivation of counsel during the sentencing hearing itself . . . abdication of judicial role by authorizing a probation officer to determine the manner of restitution . . . and in absentia sentencing" [citations omitted]), cert. denied, 531 U.S. 1179, 121 S.Ct. 1157, 148 L.Ed.2d 1018 (2001); compare United States v. Beltran, 109 F.3d 365, 371 (7th Cir.) (trial court's reliance on information that was not disclosed to defendant until immediately before sentencing hearing is generally improper, but impropriety is harmless if it could not have changed result), cert. denied, 522 U.S. 852, 118 S.Ct. 145, 139 L.Ed.2d 92 (1997); United States v. Katalinich, 113 F.3d 1475, 1484 (7th Cir.) ("[t]o succeed in challenging a sentence, a defendant must demonstrate that the information before the court was inaccurate and that the court relied on this inaccurate information"), cert. denied, 522 U.S. 905, 118 S.Ct. 260, 139 L.Ed.2d 187 (1997); United States v. Berndt, 127 F.3d 251, 260 (2d Cir.1997) (trial court improperly failed to give defendant opportunity to comment on information used in sentencing, but impropriety was harmless when defendant failed to establish that it could have changed result); United States v. Garcia, 78 F.3d 1457 (10th Cir.) (same), cert. denied, 517 U.S. 1239, 116 S.Ct. 1888, 135 L.Ed.2d 182 (1996); United States v. Ming He, 94 F.3d 782, 795 (2d Cir. 1996) (when government debriefed defendant who was cooperating witness in separate matter in absence of defendant's attorney, trial court's improper reliance on defendant's lack of candor as sentencing factor was subject to harmless error analysis); United States v. Prescott, 920 F.2d 139, 146-47 (2d Cir.1990) (trial court's denial of continuances to develop mitigating evidence was harmless absent showing that denial substantially impaired defendant's opportunity to secure fair sentence); United States v. Kramer, 711 F.2d 789, 797-98 (7th Cir.) (trial court did not abuse discretion in denying defendant access to presentence reports reviewed by court in camera when defendant made no showing that information in reports could have affected result), cert. denied, 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983); State v. Borders, 255 Kan. 871, 886-87, 879 P.2d 620 (1994) (trial court properly denied continuance to allow defendant to present additional mitigating evidence at sentencing hearing when defendant failed to demonstrate that he had any additional evidence to submit); State v. Woldegiorgis, 53 Wash.App. 92, 94-95, 765 P.2d 920 (1988) (same), review denied, 112 Wash.2d 1012 (1989); see also United States v. Dowlin, 408 F.3d 647, 668-69 (10th Cir. 2005) (when court unconstitutionally relied on judicial fact-finding in enhancing sentence, impropriety is reviewed for harmless error); United States v. Leasure, 122 F.3d 837, 840 (9th Cir.1997), cert. denied, 522 U.S. 1065, 118 S.Ct. 731, 139 L.Ed.2d 668 (1998) (improper denial of right of allocution is reviewed for harmless error).
[12] To the extent that the defendant contends that the denial of his motion for a continuance deprived him of effective assistance of counsel, he must establish prejudice to prevail on that claim. See United States v. Gonzalez-Lopez, ___ U.S. ___, ___, 126 S.Ct. 2557, 2563, 165 L.Ed.2d 409 (2006).
[13] Subsection (a) of § 4-5 of the Connecticut Code of Evidence provides: "Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person."

Subsection (b) of § 4-5 of the Connecticut Code of Evidence provides: "Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony."
[14] We address the defendant's claim that there was insufficient evidence to establish his identity as one of the shooters in part IV A of this opinion.
[15] The defendant states in his brief that Rosado "specifically denied that the defendant had threatened him or had any reason for shooting at him or at [Abdul-Hakeem]." The portion of the trial transcript cited by the defendant does not support this claim. When defense counsel asked Rosado, "[Y]ou didn't know of any reason or difficulties that he had with you or your brother, is that right," Rosado responded, "No." (Emphasis added.) Defense counsel then asked, "So . . . you wouldn't be aware of any reason he would have to shoot either one of you, is that a fair statement?" The state's attorney objected to the question, but Rosado responded, "Yeah, that's not a fair statement, no." Defense counsel then withdrew the question and the trial court ordered the response stricken from the record. Defense counsel then asked Rosado whether he had told police shortly after the shooting that he was not aware of any reason for the shooting, and Rosado responded that he did not know why it happened.
[16] In support of this claim, the defendant points to the following portion of the prosecutor's closing argument: "I'd submit to you, ladies and gentlemen [that] identification, [is] clearly the issue here. Why [should Rosado] name the defendant? Why name him? Why put him in here? Why say that it's this particular individual as opposed to somebody else? If . . . Rosado wants to get out from under the so-called problem with the parole officer, he could just give any name.

"But, he gives a name, and don't forget the following testimony from . . . Rosado . . . Rosado says about a week before, and there's no contradiction to this, the defendant is with a gun and [Robert] Payton. They're discussing something, but what does the defendant do? Remember that? He shows him the gun, shows . . . Rosado the gun and says, you want some of this? That might not be the way that you work in your business, whether it's teaching, whether it's counseling, whether it's working in a nursing home, maybe that's not the way that you talk.
"But now in the mind of . . . Rosado, is that a threat made by the defendant to him?"
[17] Under State v. Golding, supra, 213 Conn. at 239-40, 567 A.2d 823, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.)
[18] The prosecutor stated: "[A]s part of his [plea] agreement, and again, you might recall it came out on cross-examination, he has a possibility of getting less time in jail, but for what? For testifying? No, that's one factor, but for testifying truthfully.

"So therefore, if the jury has to make a determination on credibility on what [Tony] Payton has said, you have to think about the other side of this. If he's lying to anybody, it doesn't matter to you, to anybody, his plea agreement is gone and he can get up to ten years.
"The same holds true for . . . Rosado also. [Defense counsel] touched on this. If he lies, that's going to affect him. And [defense counsel] agreed there is no plea agreement, no deal with . . . Rosado. There's no evidence he's hoping for anything."
[19] He does claim, however, that "this same prosecutor's office has previously been severely criticized . . . for trying to make a similar vouching argument," and cites Bond v. Commissioner of Correction, 87 Conn.App. 50, 59-60, 863 A.2d 757, cert. denied, 273 Conn. 912, 870 A.2d 1079 (2005). See also Bond v. Warden, Superior Court, judicial district of Danbury at Danbury, Docket No. XXXXXXXXXS, 2003 WL 21329420 (May 29, 2003). In Bond, the prosecutor attempted to admit into evidence a plea agreement between a witness and the federal government requiring the witness to testify truthfully, and defense counsel objected on the basis of relevance. Bond v. Commissioner of Correction, supra, at 60, 863 A.2d 757. In the presence of the jury, the prosecutor stated that he "`knew that [the witness] would testify truthfully based on [his] personal knowledge gained from working on the case.'" Id. Defense counsel did not object to this remark. Id. The trial court stated that the truthfulness of the witness would be decided by the jury and the prosecutor could not vouch for his credibility. Id. The court sustained the defendant's objection and struck the evidence pertaining to the plea agreement. Id. The defendant later filed a petition for writ of habeas corpus in which he claimed that his attorney had been ineffective when he failed to object to the prosecutor's statement regarding his personal knowledge of the witness' truthfulness. Id., at 59, 863 A.2d 757. The Appellate Court rejected this claim, concluding that, in light of the trial court's critical statements to the prosecutor, defense counsel had made a strategic decision not to object to the remark. Id., at 60, 863 A.2d 757.

Thus, contrary to the defendant's argument in the present case, the trial court in Bond did not criticize the prosecutor for pointing to testimony pertaining to the provisions of a plea agreement requiring the witness to be truthful. Rather, the court criticized the prosecutor for vouching for the truthfulness of a witness on the basis of his personal knowledge. Whether the trial court properly excluded evidence pertaining to the plea agreement between the witness and the federal government was not at issue in Bond.
[20] Tony Payton testified that he had recognized the defendant at the time of the shooting because he had seen him many times in the neighborhood, but that he did not know his name or street name. He also testified that he had recognized one of the shooters as McClain. After the shooting, he heard rumors that someone named "Kaiser" had been involved, but he did not know that that was McClain's street name until April Edwards told him so two months after the shooting.
[21] Tony Payton testified that he was on his way to Pettway's on the night of the shooting when a man on the other side of the street, whom he did not recognize, told him to "watch out, there [are] some guys riding around in a white car, I don't know what they [are] up to." Payton then decided to avoid the street and to cut through the backyards of the houses on the south side of Stratford Avenue. When he arrived at the area near the intersection of Stratford Avenue and Fifth Street, he hid next to a house on the south side of Stratford Avenue for a period of time. He testified that he was able to see all of Fifth Street and the area in front of the door to Pettway's from his hiding place. When he was asked to point out his location on a police sketch of the area, he pointed to an area to the southeast of Pettway's, near a utility pole. The defendant argues that, if Payton had been hiding in that area, his view of Pettway's and Fifth Street would have been blocked by the utility pole.
[22] The defendant also contends that he could not be found guilty of attempted murder under a theory of transferred intent. See State v. Hinton, 227 Conn. 301, 316-18, 630 A.2d 593 (1993) (doctrine of transferred intent does not apply to attempt crimes). Because the state did not prosecute the defendant under a theory of transferred intent, and the jury received no instructions on the doctrine, we need not address this issue.
[23] The jury also reasonably could have concluded that, even if the defendant's hostility toward Robert Payton's associates did not extend to Burton, the defendant wanted to eliminate witnesses to the shooting.
[24] General Statutes § 53a-8(a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

As we discuss in part V of this opinion, the trial court instructed the jury on the principles of accessory liability.
[25] In his main brief, the defendant contends only that the evidence presented at trial was insufficient to support a finding that he intended to kill Burton. In his reply brief, he contends for the first time that it was unethical and a violation of due process for the prosecutor to put forward factually inconsistent theories during the presentation of evidence and at the sentencing hearing. See Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000). As we have indicated, however, the prosecutor's suggestion that Burton was an innocent bystander was not necessarily inconsistent with his claim that the defendant intended to kill Burton. In any event, "[i]t is a well established principle that arguments cannot be raised for the first time in a reply brief." (Internal quotation marks omitted.) State v. Peeler, 271 Conn. 338, 373 n. 36, 857 A.2d 808 (2004), cert. denied, 541 U.S. 1029, 126 S.Ct. 94, 163 L.Ed.2d 110 (2005). Accordingly, we decline to address this claim.
[26] "Kenny" apparently was John Soares' nickname.
[27] The defendant relies on Tony Payton's testimony that "whoever [the defendant] wanted he had, he could have got everybody."
[28] Rosado testified that, immediately after the shooting, Abdul-Hakeem was lying on the ground near the door to Pettway's and a man named "Country" then dragged him toward the van. Rosado also testified that, after he and Abdul-Hakeem were taken to the hospital, he was initially told that his brother was going to live. The medical examiner's report indicates that Abdul-Hakeem "lost pulses" after he was brought to the emergency room, and was declared dead at 4:21 a.m.
[29] Under the common design theory, "[a]ll who join in a common design to commit an unlawful act, the natural and probable consequence of the execution of which involves the contingency of taking human life, are responsible for a homicide committed by one of them while acting in pursuance of, or in furtherance of, the common design." (Internal quotation marks omitted.) State v. Cots, 126 Conn. 48, 59, 9 A.2d 138 (1939).
[30] Under the Pinkerton doctrine, "a conspirator may be held liable for criminal offenses committed by a coconspirator if those offenses are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy." State v. Diaz, 237 Conn. 518, 526, 679 A.2d 902 (1996), citing Pinkerton v. United States, 328 U.S. 640, 647-48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).
[31] The state contended at oral argument before this court that, because the trial court had held multiple charging conferences with the defendant and the state, review of this claim is precluded by State v. Cruz, 269 Conn. 97, 106-107,848 A.2d 445 (2004) (Golding review is not available for unpreserved claims of induced instructional error). In Cruz, however, the defendant actually requested the instruction that he later claimed to be improper. Id., at 102, 848 A.2d 445. The state does not suggest that the defendant in the present case requested the challenged instruction. Accordingly, we conclude that Cruz is not applicable here.
[32] The court instructed the jury that it could convict the defendant as an accessory only if it found that he possessed the following: "the mental state required for the commission of an offense"; "the mental state required, that is the criminal intent required by the statute for the commission of the crime"; "a criminality of intent and an unlawful purpose in common with the actual perpetrator"; "criminal and common intent [with the perpetrator]"; "the same criminal intent required for the crime for which he is an accessory"; "the intent to commit the crime of murder . . . where, as here, he [is accused of being] an accessory by aiding the commission of that crime"; "the same mental state required for the commission of the underlying crime and . . . the same unlawful purpose in common with the person who actually commits that crime"; and "the same criminal intent and unlawful purpose necessary to be guilty of the crime as does the actual perpetrator, that is, the principal."